### In re GENERAL MOTORS CLASS E STOCK BUYOUT SECURITIES LITIGATION.

**Master File No. Misc. 87–47.**

United States District Court,
D. Delaware.

Sept. 7, 1988.

Clark W. Furlow of Lassen, Smith, Katzenstein and Furlow, Wilmington, Del., Liaison Counsel, Nicholas E. Chimicles and Alfreda L. Verratti of Greenfield \&  Chimicles, Haverford, Pa., Lead Counsel, Michael J. Freed and Kenneth A. Wexler of Much

Shelist Freed Denenberg Ament & Eiger, P.C., Robert A. Holstein and Stephanie Whitman of Holstein, Mack & Dupree, Marvin A. Miller and Patrick Cafferty of Washlow, Chertow & Miller, Frederic F. Brace, Jr. and Ellen A. Rubel of Law Offices of Frederic F. Brace, Jr., Chicago, Ill., for plaintiffs.

William O. LaMotte, III and Thomas Reed Hunt, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Stephen C. Neal, Robert J. Kopecky and Helen E. Witt of Kirkland & Ellis, Chicago, Ill., Michael J. Basford and Louis H. Lindeman, Jr., General Motors Corp., Detroit, Mich., for defendant General Motors Corp.

E. Norman Veasey, R. Franklin Balotti and Thomas A. Beck, of Richards, Layton & Finger, Wilmington, Del., Dennis J. Block, Irwin H. Warren, Stephen A. Radin and Timothy E. Hoeffner of Weil, Gotshal & Manges, New York City, for General Motors Corp. Director defendants except Donald J. Atwood, F. James McDonald, Lloyd E. Reuss, F. Alan Smith, Roger B. Smith, and Robert C. Stempel.

Grover C. Brown and Barbara MacDonald of Morris, James, Hitchens & Williams, Wilmington, Del., Roy F. Reardon and Joseph F. Tringali of Simpson, Thacher & Bartlett, New York City, for General Motors Director defendants Donald J. Atwood, F. James McDonald, Lloyd E. Reuss, F. Alan Smith, Roger B. Smith, and Robert C. Stempel.

Bruce M. Stargatt and David C. McBride of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Thomas D. Barr, Evan R. Chesler and Christopher M. Mason of Cravath, Swaine & Moore, New York City, Thomas W. Luce, III and M. David Bryant, Jr. of Hughes & Luce, Dallas, Tex., for defendant H. Ross Perot.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Plaintiff shareholders filed class and derivative claims against General Motors Corporation ("GM") as a nominal defendant, certain directors of GM, and H. Ross Perot,

former director of GM and former chairman of the board of Directors of Electronic Data Systems ("EDS"). They contest GM's purchase of GM Class E stock and contingent note from Perot and three other EDS officers.

The defendants have filed motions to dismiss all six counts in the Second Amended Consolidated Complaint ("the Complaint"). The Counts are as follows: Count I, a class claim under Securities and Exchange Commission ("SEC") Rule 10b–5 alleging Perot and the director defendants made material misstatements and omissions; Count II, a class claim under SEC Rule 13c–4 alleging the transaction between Perot and GM was a tender offer and defendants failed to make the required disclosures; Count III, a class claim alleging Perot and the director defendants breached their fiduciary duty and injured plaintiffs by depressing the value of their stock; Count IV, a class claim alleging the director defendants breached their fiduciary duty by failing to extend the same offer to other GME stockholders as made to Perot and other EDS officers; Count V, a derivative claim against the director defendants and Perot as an aider and abettor alleging the buyout constituted a waste of corporate assets; and Count VI, a derivative claim against the director defendants alleging the buyout was a breach of their fiduciary duty.

Plaintiffs allege the jurisdiction for Counts I and II is based upon a federal question jurisdiction under 28 U.S.C. 1331 and 15 U.S.C. § 78aa, the Securities Exchange Act of 1934 ("Exchange Act"). ¶ 7. Plaintiffs allege jurisdiction for Counts II, IV, V and VI based upon diversity of citizenship under 28 U.S.C. § 1332 and pendent jurisdiction. ¶¶ 8, 9.[1]

## I. *Background* [2]

Perot founded EDS in 1962 and negotiated the merger of EDS and GM in 1984. ¶¶ 13, 14. Under the terms of the merger EDS became a wholly owned subsidiary of GM, and Perot continued as chairman of EDS and he became a member of the Board of Directors of GM ("the Board"). ¶ 14. In addition, EDS stockholders had the right to exchange each share of EDS stock for $44.00 in cash, or $32.50 in cash plus one-fifth of a share of the newly issued GM Class E ("GME") stock, one-fifth of a non-transferable contingent note and a "special interest" to compensate for federal tax consequences. ¶ 15. The contingent note entitled holders to receive, beginning in 1989, an amount of cash equal to the difference between a preset redemption price and the then current market price for GME stock. ¶ 16. The note also provided for a discount rate of 7.18% per six months for redemptions prior to the final redemption in 1991.[3] *Id.* Perot exchanged his EDS stock for cash, GME stock and notes. ¶ 18. He thus owned 1% of GM's total outstanding stock and 18% of GME stock, and became GM's largest shareholder. *Id.* GME shareholders were to be paid dividends based entirely upon the profitability of EDS and not GM as a whole. ¶ 19(A). One of the significant goals of the merger was to assist GM by adding the "entrepreneurial spirit" of Perot and EDS. ¶ 19(D).

---

1. Plaintiffs allege they had diversity in each of the transferor districts prior to the transfer order by the Judicial Panel on Multidistrict Litigation.

2. The facts set forth are contained in plaintiffs' Second Amended Consolidated Complaint, Dkt. 57, and the reference is to the paragraph numbers in that Complaint.

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) a "district court must limit its consideration to the facts alleged in the complaint." *Biesenbach v. Guenther,* 588 F.2d 400, 402 (3d Cir.1978). Defendants' motion seeks to dismiss plaintiffs' Second Amended Consolidated Complaint. The Court, therefore,

will consider only the allegations contained in that Complaint, and will not consider any material included in earlier complaints but deleted from the Second Amended Consolidated Complaint.

3. The following schedule applied to the discount of the redemption price:

| Date | | Redemption Price | Discount Price |
|------|------|------|------|
| Fall, | 1991 | $62.50 | 7.18% |
| Spring, | 1991 | 58.01 | 7.18% |
| Fall, | 1990 | 53.84 | 7.18% |
| Spring, | 1990 | 49.97 | 7.18% |
| Fall, | 1989 | 46.38 | 7.18% |

¶ 16.

Although GM later became EDS's largest customer and accounted for 75% of its business, EDS was guaranteed a certain independence from GM. ¶¶ 19(C), 24. To maintain this autonomy, GM and EDS senior management negotiated agreements which provided: one, that separate financial records would be kept and GM would not do an internal audit of EDS; two, that Perot, in conjunction with EDS management, would continue to make EDS employment and compensation decisions; and three, that price for services EDS provided to GM would be negotiated on an arm's length basis. ¶¶ 26, 23. Disputes arose over the issues covered by these agreements. ¶ 28. GM demanded that it be allowed to conduct an internal audit of EDS, wanted a committee of the GM board to decide the EDS compensation package and sought favorable price and contract terms from EDS. ¶ 28. Perot opposed these measures by GM and also became a vocal critic of GM policy both publicly and internally. ¶ 29–33. Perot was the only board member to oppose GM's purchase of Hughes Aircraft. ¶ 34. In the fall of 1986, he was quoted in Newsweek as saying that changing GM was like "teaching an elephant to tap-dance." ¶ 35. He also criticized GM for making second-rate cars. *Id.* Despite Perot's disagreements with GM, EDS and GM resolved their disputes over audits, executive compensation and pricing. ¶ 37.

Perot suggested a buyout to Roger Smith, chairman and chief executive officer of GM in May, 1986 and a partial buyout in June, 1986, but was told by GM only a total buyout was acceptable. ¶ 45. Sometime during the summer of 1986, GM management decided that EDS would no longer be autonomous, that Perot's relationship with GM would be terminated and Perot's silence must be purchased. ¶ 39. No public statement was made on this decision. ¶ 41. In October, 1986 GM attempted to sell EDS to AT & T but the talks collapsed in early November. ¶ 42. On November 26, 1986 Smith claimed "EDS isn't for sale; we have never had it on the auction block or any-

thing like that." ¶ 44. In response to an inquiry about whether Smith was saying GM never offered to sell EDS to AT & T, a GM spokesperson responded "That's correct." *Id.*

After collapse of the talks between AT & T and GM, Elmer Johnson, GM Vice-President and General Counsel, and Tom Luce, Perot's attorney, began discussions of GM's purchase of Perot's stock. ¶ 45. The negotiations concluded on November 28, 1986 when the final details were ironed out. ¶ 46. GM did not make these negotiations public. *Id.* On November 30, 1986 a small group of Board members met concerning the buyout and many Board members first learned of the proposed transaction. ¶ 48. A regularly scheduled Board meeting was held on December 1, 1986. ¶ 49.[4] It was called for 9:00 a.m. and ended before noon. *Id.* GM management briefed the directors not present at the November 30 meeting on the transaction. *Id.* Although disputes over EDS's autonomy had been resolved, GM management told the Board that Perot's position on EDS created irreconcilable disputes and that GM should terminate its relationship with Perot. ¶ 50. The Board approved the terms of the buyout, which were announced to the public shortly after the meeting. ¶¶ 51, 53. GM agreed to purchase the stock of Perot and three other high-ranking EDS officers for $61.90 a share, or $742.8 million for the 12 million shares. ¶ 51. Of that $61.90 per share GM allocated $33 to GME stock, $23.50 to the nontransferable contingent notes and $5.40 to the Special Interest tax payment. ¶ 52. In return Perot agreed to resign from the GM directorship, not to purchase GM shares for five years, not to seek control of GM for five years, to pay a $7.5 million penalty for publicly criticizing GM or its management in the future, not to compete for three years and not to recruit EDS executives for eighteen months. ¶ 52.

Following announcement of the buyout, Perot stated the money would be in escrow for two weeks to allow the Board to change its mind, claimed the buyout was evidence of self-interest and questioned GM's use of

4. Perot had planned to oppose year-end bonuses for senior management at this meeting. ¶ 47.

its capital in this manner. ¶¶ 54–56. After the December 1 announcement, GME stock declined $4.50 per share and continued to fall for several months. ¶ 57. GM Common and Class H stock also fell. *Id.* GM publicly stated that the buyout of Perot was to eliminate Perot's demands for complete EDS autonomy and to allow for EDS's integration into GM. ¶ 58.

On January 21, 1987 a demand was made on GM's Board on behalf of Barbara Zarowitz and others, including a plaintiff in this action, that GM rescind the transaction with Perot or commence legal proceedings against the Board. ¶ 76 and letter of January 21, 1987.[5] In its letter of February 6, 1987 the Board responded that "following review" it decided in its February 2, 1987 meeting to refuse the demands. ¶ 76 and letter of February 6, 1987. The complaint alleges that the Board neither reviewed its original decision, constituted a special investigation committee, nor conducted any inquiry in response to the demand. ¶¶ 77, 78.

Several separate complaints were filed in different federal district courts. On April 24, 1987 the Judicial Panel on Multidistrict Litigation transferred four actions to the District of Delaware which had one action pending. Plaintiffs filed a Consolidated Complaint on June 19, 1987 and a First Amended Consolidated Complaint on July 22, 1987. On September 21, 1987 plaintiffs moved to file another amended complaint in lieu of a response to defendants' motion to dismiss. The Court granted this motion and the Second Amended Consolidated Complaint was filed on December 31, 1987.[6]

Other actions were filed in state courts on the same transaction. In *Grobow v. Perot,* 526 A.2d 914 (Del.Ch. 1987) (Jacobs, V.C.), *aff'd,* 539 A.2d 180 (Del.1988), the Delaware Chancery Court dismissed three consolidated shareholder derivative actions based upon plaintiffs' failure to make a demand and failure to allege facts excusing the demand. On March 15, 1988 the Delaware Supreme Court affirmed this dismissal. *Grobow v. Perot,* 539 A.2d 180 (Del. 1988). In *Levine v. Smith,* Civ.Act. No. 8833 (Del.Ch. Dec. 22, 1987) [available on WESTLAW, 28885], Vice Chancellor Jacobs denied plaintiffs' motion for discovery prior to the motion to dismiss. In *Hart v. General Motors Corp.,* 129 App.Div.2d 179, 517 N.Y.S.2d 490 (N.Y.App.Div.), *leave to appeal denied,* 70 N.Y.2d 608, 521 N.Y.S.2d 225, 515 N.E.2d 910 (N.Y.1987), a panel of the Appellate Division of the New York Supreme Court ordered the complaint dismissed on the ground of *forum non conveniens.*[7]

The motion to dismiss has been briefed, with supplemental briefing on the Delaware Supreme Court decision in *Grobow* and the United States Supreme Court decision in *Basic, Inc. v. Levinson,* —— U.S.

---

**5.** ¶ 76 of the Second Amended Consolidated Complaint refers to the January 21, 1987 letter of demand and the February 6, 1987 letter of response by GM as attached to the complaint. Therefore, the letters will be treated as part of the Complaint and part of the record on this motion to dismiss even though the documents were *physically attached to the Consolidated Complaint, Dkt.* 29, and not to the Second Amended Consolidated Complaint, Dkt. 57.

**6.** In oral argument on plaintiffs' motion to amend the First Consolidated Complaint, counsel for plaintiff informed the Court that the proposed Second Amended Consolidated Complaint would incorporate information learned by the plaintiffs in *Hart v. General Motors,* 129 App.Div.2d 179, 517 N.Y.S.2d 490 (N.Y.App. Div.), *leave to appeal denied,* 70 N.Y.2d 608, 521 N.Y.S.2d 225, 515 N.E.2d 910 (N.Y.1987). Docket Item ("Dkt.") 56, at 13–16. Counsel for plaintiffs also represented to the Court that the pro-

posed Second Amended Consolidated Complaint "contains everything that we know that is relevant to the issue of whether the business judgment rule should apply...." *Id.* at 11. In addition, plaintiffs' answering brief to this present motion states that material obtained through discovery in *Hart* was included in the Second Amended Consolidated Complaint. Dkt. 67 at 62–64.

**7.** Hart apparently also filed a federal action in the Southern district of New York. Steps were taken to transfer that action to the Delaware District via the Judicial Panel on Multidistrict Litigation which conditionally granted the transfer. Because Hart opposed the conditional transfer order, the Judicial Panel on Multidistrict Litigation stayed its conditional transfer order to this district for *Hart v. General Motors Corporation,* S.D.N.Y., C.A. No. 88–CIV–4378 (TPG), and scheduled a hearing for September 29, 1988.

——, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Oral argument was held June 14, 1988.

## II. *Analysis*

### A. Standard on Motion to Dismiss

A motion to dismiss a complaint for failure to state a claim should not be granted unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The factual allegations in the complaint must be accepted as true. *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980); *D.P. Enterprises v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984). Although "[r]easonable factual inferences will be drawn to aid the pleader," 725 F.2d at 944, a court need not accept any conclusory allegations or statements of law. *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984); *Sinchak v. Parente,* 262 F.Supp. 79, 81 (W.D.Pa.1966). On a motion to dismiss, a district court is limited to the facts alleged in the complaint. *Biesenbach v. Guenther,* 588 F.2d 400, 402 (3d Cir.1978).

### B. Count I—Rule 10–b Claim

■ Plaintiffs assert that the GM directors and Perot violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1982) and Rule 10b–5 promulgated thereunder by the SEC, by making false material statements and failing to disclose material information. Specifically, plaintiffs contend the defendants failed to disclose the decision by GM management in the summer of 1986 that EDS's autonomy within GM must end, that Perot's relationship with GM would be terminated and that GM must purchase Perot's silence. *See* ¶ 39 of Complaint. Plaintiffs also allege defendants breached

Rule 10b–5 by not revealing the negotiations in October 1986 to sell EDS to AT & T and by the statement on November 26, 1986 made by Roger Smith, chairman and chief executive officer of GM, that EDS was not for sale and GM had "never had it on the auction block or anything like that." ¶ 44. In addition, plaintiffs claim violations occurred when defendants failed to disclose the buyout negotiations between GM's General Counsel and Perot's attorney which began in early November 1986. Finally, GM's failure to disclose the terms and conditions of the November 28, 1986 buyout agreement until December 1, 1986 is alleged to have violated securities law.

Section 10(b) of the Exchange Act forbids persons, in connection with the purchase or sale of securities, from engaging in manipulation or fraud in violation of rules promulgated by the SEC. 15 U.S.C. § 78j (1982).[8] SEC Rule 10b–5 further forbids fraud and states:

Employment of manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon

---

**8.** Section 10 states in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of and means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

....

(b) To use or employ, in connection with the purchase or sale of any security registered

on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (1982).

any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Defendants assert that plaintiffs lack the standing necessary to maintain a claim for actions occurring after November 20, 1986, the date the named plaintiff made his last purchase of GME stock. Plaintiffs bring Count I as a class claim on behalf of all shareholders purchasing GME stock from the summer of 1986 through December 1, 1986. ¶ 79(A). The named plaintiff, Elliot Dubowski, purchased 100 shares of GME stock on November 17, 1986 and 200 shares on November 20, 1986. ¶¶ 3, 84.

A court must assess standing to sue based upon the standing of the named plaintiffs and not upon the standing of unidentified class members. *Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975). As the United States Supreme Court stated,

> Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, "none may seek relief on behalf of himself or any other member of the class."

*Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)). *See also Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 1925 n. 20, 48 L.Ed.2d 450 (1976). For example, in a challenge to a state abortion statute, the Supreme Court found the named plaintiff could not contest the statute on behalf of unmarried minor girls who were mature and emancipated, when no evidence was alleged or proffered that either she or any member of the class was mature or emancipated. *H.L. v. Matheson*, 450 U.S. 398, 405–06, 101 S.Ct. 1164, 1169–70, 67 L.Ed.2d 388 (1981). Plaintiff was allowed to pursue her claim on behalf of unmarried minor

girls who were dependent, unemancipated and whose maturity was not established. *Id.* at 407, 101 S.Ct. at 1170. The United States Court of Appeals for the Ninth Circuit has found that a named plaintiff may not bring an action on behalf of stock purchasers with claims the named plaintiff does not have. *Feldman v. Simkins Industries, Inc.*, 679 F.2d 1299, 1302, 1306 (9th Cir.1982). Therefore, the standing of plaintiffs to assert a class claim must be based upon the injury suffered by Mr. Dubowski, not any injury suffered by unidentified class members, and the Court must limit the claim accordingly.

To maintain a private action for damages under Section 10(b) and Rule 10b–5, plaintiffs must be purchasers or sellers of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 1939 (1975). One of the elements to be proved in a section 10 claim is a loss to the plaintiff resulting from reasonable reliance upon a materially false representation. *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir.1986).[9] *See also Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234, 1237 (3d Cir.1976) (plaintiff must show purchase or sale in connection with fraud and injury). In order to establish standing in a 10b–5 claim, plaintiffs must allege purchase or sale of the stock "within a reasonable period of time after the alleged fraudulent conduct occurred to support an inference of reliance." *Marsh v. Armada Corp.*, 533 F.2d 978, 981–82 (6th Cir.1976).

Plaintiffs herein must allege injuries resulting from reliance upon defendants' material misstatements or omissions. No reliance can be established for events occurring after the purchase or sale of stock. Any injuries sustained by the named plaintiff necessarily resulted from events occurring prior to his last purchase on November 20, 1986. No action may be brought on behalf of unidentified members of the proposed class who made stock purchases after November 20, 1986 and were injured by misstatements or failures to disclose occur-

---

**9.** Reliance may be proved through use of the fraud on the market theory. *See Basic Inc. v.* *Levinson*, ––– U.S. –––, 108 S.Ct. 978, 990–92, 99 L.Ed.2d 194 (1988); *Peil*, 806 F.2d at 1161.

ring after November 20, 1986. Plaintiffs have no standing to assert class claims based upon events after November 20, 1986. It follows the Court cannot consider the statements by Roger Smith and the GM spokesperson on November 26, 1986 or the failure to disclose the terms of the agreement allegedly reached November 28, 1986 between the attorneys for Perot and GM.

■ The Court will now turn to the materiality of the information the plaintiffs allege Perot and the director defendants failed to disclose between the summer of 1986 and November 20, 1986. The recent Supreme Court case of *Basic Inc. v. Levinson*, —— U.S. ——, 108 S.Ct. 978, 99 L.Ed. 2d 194 (1988), sets forth the standard for materiality in the context of Section 10(b) and Rule 10b–5. In *Basic*, stockholders sued the corporation and its directors for violation of Section 10(b) and Rule 10b–5 by the public denial that it was engaged in merger negotiations, when in fact it was involved in negotiations. *Id.* 108 S.Ct. at 981. The *Basic* Court adopted the materiality standard employed in the proxy solicitation context in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). 108 S.Ct. at 983. For a fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." 108 S.Ct. at 983 (quoting *TSC Industries*, 425 U.S. at 449, 96 S.Ct. at 2132). To resolve the difficulties presented by the contingent and speculative nature of facts concerning merger negotiations, the Court adopted a fact specific analysis based "upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activities." 108 S.Ct. at 983–84, 987 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1960)). The Court suggested that the probability of an event might be determined by the "indicia of interest in the transaction at the highest corporate levels" such as "board resolutions, instructions to investment brokers, and actual negotiations between principals or their intermediaries...." 108 S.Ct. at 987. In assessing the magnitude of a transaction such as a merger to the issuer of the allegedly manipulated securities, a court is to consider facts such as "the size of the two corporate entities and of the potential premiums over market value." *Id.* The Court stressed that no one event or fact determines the materiality of merger negotiations. *Id.* This probability/magnitude evaluation used by the Supreme Court in the context of merger negotiations also applies to contingent and speculative events such as AT & T's possible purchase of EDS and GM's plan to buy out Perot. Not all of the examples of indicia used by the Supreme Court will apply to non-merger transactions. The Court will evaluate each of the actions plaintiffs allege violated Rule 10b–5 in chronological order.

The probability of a transaction occurring must be considered in light of the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed. In adopting the probability/magnitude test of materiality, the *Basic* Court acknowledged that many mergers never in fact take place. 108 S.Ct. at 987 & n. 16. Corporations must make an assessment when the negotiations are in progress and cannot wait until there is an agreement in principle. *See id.* 108 S.Ct. at 986. The Court therefore cannot consider the fact that a sale or buyout occurred as determinative of the materiality of the negotiations or discussions.

The magnitude of any of the events must be measured by the effect on EDS, not by the effect on GM as a whole. Only GME stockholders are plaintiffs in this 10b–5 claim. The dividends paid to GME stockholders were based solely on EDS's profitability, not that of GM. ¶ 19(A). The price for GME stock and any decision to buy or sell that stock is intimately tied to the future of EDS. Events that affect GM as a whole would have a diminished impact upon GME shareholders.

**1128**

First, plaintiffs point to the decision by GM management in the summer of 1986 to terminate EDS's autonomy and Perot's relationship with GM. Because this alleged decision was made solely by management and there were no negotiations with Perot or a proposed purchaser for EDS until that fall, the transaction was not highly probable in the summer. However, the effect of the possible changes with respect to EDS would be significant. Perot was intimately connected with the success of EDS and any severance of Perot from EDS would affect its profitability. *See* ¶ 13. The substantial impact of the transaction upon EDS must be balanced against the very low probability as of the summer of 1986 that it would occur. Although a close question, I conclude a reasonable investor would not consider GM's management's proposed, indefinite plan to be significant. Thus, GM management's unilateral decision to end the autonomy of EDS and their relationship with Perot is not a material fact within the meaning of Rule 10b–5.

■ Second, plaintiffs maintain that the talks between GM and AT & T over the sale of EDS were material and should have been disclosed.[10] The complaint does not state the level of corporate involvement, who did the negotiating and whether the Board was involved. Hence, at the time of the discussion, the probability of AT & T's purchase occurring is unclear. On the issue of the transaction's magnitude, although the complaint alleges no details of the proposed deal between AT & T and GM, any sale would affect EDS's operations and likely profitability and be viewed as significant by a reasonable investor in GME stock. Under *Basic* the analysis is highly fact specific and no one fact determines materiality. 108 S.Ct. at 987. Be-

cause a motion to dismiss should not be granted unless beyond a doubt there is no set of facts which could be plead and support the claim, *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–102, the Court finds that plaintiffs have sufficiently stated that the materiality of the AT & T/GM negotiations under Rule 10b–5.[11]

■ Finally, the Court must consider the negotiations between Paul Johnson, GM General Counsel and Vice–President, and Perot's attorney concerning GM's purchase of Perot's stock. These negotiations were conducted by intermediaries of the principals, and there was a high probability the event would occur. In addition, the magnitude of the effect on EDS was substantial. Perot had founded EDS and his leadership and skill was largely responsible for its profitability. ¶ 13. GME dividends were based solely on the profitability of EDS, not of GM as a whole. ¶ 19(A). GM was negotiating a large premium over market value to Perot for his EDS stock. Disclosure of these negotiations would have been viewed as significant by the reasonable investor, and these facts are material under Rule 10b–5.

■ Resolution of the materiality of these facts does not end the discussion. Defendants must be under a duty to disclose to be found liable under Section 10. Although the decision in *Basic* dealt with misstatements, not omissions, the Court's decision specifically left intact the requirement of a duty to disclose as well as materiality. 108 S.Ct. at 987 n. 17. The Court stated "[t]o be actionable, of course, a statement must also be misleading. Silence absent a duty to disclose is not misleading under Rule 10b–5." *Id.* As the Supreme Court stated in *Chiarella v. Unit-*

**10.** The Court will not consider the November 26, 1986 statements by Smith and the GM spokesperson because it has found plaintiffs lack standing to raise that issue in their class claims.

**11.** The requirement in Federal Rule of Civil Procedure 9(b) that fraud must be pleaded with particularity does not mandate a different result. Under Rule 9(b) the circumstances of the alleged fraud must be plead with sufficient particularity to place defendants on notice of exact misconduct with which they are charged. *Se-*

*ville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Rule 9(b) applies to allegations of fraud under Rule 10b–5. *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1490 (D.Del.1984). Plaintiffs have sufficiently plead allegations of material omissions to put defendants on notice of the conduct with which they are charged.

*ed States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980), "one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so and the duty to disclose arises when one party has information 'that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " An insider who trades on material information has a duty to disclose that information because failure to do so constitutes fraud under Rule 10b–5. *Id.* at 230, 100 S.Ct. at 1115. The United States Court of Appeals for the First Circuit summarized the circumstances leading to a duty to disclose in *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987). There is a duty to make information accurate, complete and not misleading when a corporation does disclose material information. *Roeder*, 814 F.2d at 26 (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860–61 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), and *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 409 (N.D.Ill.1984)). Indeed Rule 10b–5(b) specifically prohibits the omission of material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b–5(b). A corporation may also have a duty to correct or verify rumors in the marketplace directly attributable to the company. *See State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 850 (2d Cir. 1981). Absent a specific statutory or regulatory duty, insider trading, a fiduciary duty or rumors attributable to the company, a corporation and its officers have no affirmative duty of disclosure. *See Roeder*, 814 F.2d at 27; *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988).

This Court finds unpersuasive the decision in *Issen v. GSC Enterprises*, 538 F.Supp. 745, 751 (N.D.Ill.1982), that a corporation has a duty to disclose material information in its annual report. *Issen* stands alone in the imposition of an affirmative duty, *Roeder*, 814 F.2d at 27 n. 2, and other decisions in the same district have refused to follow *Issen*. *See Rowe v. Maremont Corp.*, 650 F.Supp. 1091, 1104–05 (N.D.Ill.1986); *Issen v. GSC Enterprises*, Nos. 74 C 0316 & 74 C 2215 (N.D.Ill. Oct. 26, 1984) [available on WESTLAW, 1984 WL 1255].

The plaintiffs have plead no facts to support imposition of a duty to disclose upon Perot or the director defendants. There are no allegations of insider trading, rumors or the need to correct inaccurate or misleading information.[12]

Count I of the Second Amended Consolidated Complaint will be dismissed.

### C. Count II—Williams Act Violation

In Count II of the Second Amended Consolidated Complaint, brought on behalf of two classes of GME shareholders and holders of contingent notes, plaintiffs contend the offer by GM to purchase the securities held by Perot and three other highranking EDS officials constitute a tender offer and defendants failed to comply with the requirements of the Williams Act. Section 13(e) of the Exchange Act, 15 U.S.C. § 78m(e) (1982), and Rule 13e–4, 17 C.F.R. § 240.13e–4, promulgated thereunder regulate tender offers by the issuers of a security. The threshold question is whether the offer by GM to Perot and three EDS executives was a tender offer.

Although the term "tender offer" is used in the statute and in the accompanying regulations issued by SEC, neither provide a definition. Looking to the legislative history, courts have determined that privately negotiated transactions and open market purchases do not fall within the strictures of the Williams Act. *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 56 (2d Cir.1985) (citing several cases); *Wellman v. Dickinson*, 475 F.Supp. 783, 817–18 (S.D.N.Y. 1979), *aff'd*, 682 F.2d 355 (2d Cir.1982),

---

**12.** The Court has ruled the plaintiffs lack standing to base any claims upon the statements of

November 26, 1986.

*cert. denied sub nom., Dickinson v. SEC,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

The court in *Wellman* established an eight factor test to distinguish a tender offer:

> (1) active and widespread solicitation of public shareholders for the shares of an issuer;
>
> (2) solicitation made for a substantial percentage of the issuer's stock;
>
> (3) offer to purchase made at a premium over the prevailing market price;
>
> (4) terms of the offer are firm rather than negotiable;
>
> (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased;
>
> (6) offer open only for a limited period of time;
>
> (7) offeree subjected to pressure to sell his stock;
>
> . . . .
>
> [ (8) ] public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target company's securities.

475 F.Supp. at 823–24. These factors will be considered seriatim.

One, there was no widespread or active solicitation. In fact, the complaint alleges in paragraph 45 that Perot solicited GM to purchase his shares and fails to allege that GM solicited any one. The complaint also fails to assert that the final purchase offer by GM was extended to any persons other than Perot and the other three EDS officials.

■ Two, was the solicitation for a substantial portion of the issuer's stock? If there was no solicitation, there can be no solicitation for a substantial portion. *See Energy Ventures, Inc. v. Appalachian Co.,* 587 F.Supp. 734, 741 (D.Del.1984).

Three, the offer to purchase was for a premium over the market price. On the last market day before the purchase, GME stock was selling for $31.375 a share. GM paid Perot and the others a total of $61.90

a share, allocating $33 for each share of GME stock, $23.50 for the contingent notes and $5.40 for the tax payments. ¶ 51.

Four, the terms were the product of negotiations between attorneys for Perot and GM rather than a firm offer by GM. *See* ¶¶ 45, 46.

Five, the question is whether the offer was contingent on a fixed number of shares. GM wished to purchase all of the shares held by Perot. ¶ 45. It may be assumed that GM intended to purchase a fixed number of GME or GM stock, namely, that owned by Perot.

Six, no facts are alleged to support the conclusion that the offer was open only for a limited time.

Seven, similarly, no facts are alleged to support the conclusion that Perot and the others were subject to pressure to sell their stock.

Eight, no allegations are made that the defendants made any public announcements of the proposed purchase.

The Court concludes application of the test is inconclusive and agrees with the Second Circuit appellate court that *Wellman* should not be used as a "litmus test" to define a tender offer. *See Hanson Trust,* 774 F.2d at 57. The Court turns to the reasoning used in *Hanson Trust.*

> [S]ince the purpose of § 14(d) is to protect the ill-informed solicitee, the question of whether a solicitation constitutes a "tender offer" within the meaning of § 14(d) turns on whether, viewing the transaction in the light of the totality of circumstances, there appears to be a likelihood that unless the preacquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them.

*Hanson Trust,* 774 F.2d at 57.

If in fact GM solicited Perot and the three other high-ranking EDS officials, each of the solicitees were sophisticated and well-informed investors. Based on their positions in EDS they would know the value of the GME stock, contingent notes

and special interests purchased by GM. The details of the transaction were negotiated by attorneys, not presented by GM as a take it or leave it offer. The purchase by GM does not come within the scope of transactions and sellers the Williams Act was intended to protect, and is not a tender offer.

Count II of the Second Amended Consolidated Complaint will be dismissed.

### D. Count III—Class Claim for Breach of Fiduciary Duty

■ Plaintiffs bring Count III as a class claim on behalf of all persons who owned GM stock on December 1, 1986. They allege defendants breached their fiduciary duty and harmed the class by decreasing the value of their stock.

Initially, the Count notes that Counts III, IV, V and VI are state law claims to be determined under the laws of the State of Delaware. GM is an Delaware corporation. ¶ 4. A corporation is governed by the corporate law of the state of the incorporation. *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 107 S.Ct. 1637, 1650, 95 L.Ed.2d 67 (1987). Delaware law determines the duties and privileges of the Board of Directors, as well as the rights and obligations of the shareholders.

As a threshold question, the Court must decide whether plaintiffs have properly stated a class claim or whether this must be brought as a shareholders' derivative suit. To make this decision the Court must examine the nature of the wrongs alleged in the complaint, not the label employed by the plaintiffs. *Kalmanovitz v. G. Heileman Brewing Co.*, 595 F.Supp. 1385, 1399 (D.Del.1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985); *Lipton v. News International*, 514 A.2d 1075, 1078 (Del.1986). The harm alleged by plaintiffs in Count III is a decrease in the value of their stock. ¶ 104. However, under Delaware law "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation." *Bokat v. Getty Oil Co.*, 262 A.2d 246, 249

(Del.1970). *See also Kalmanovitz,* 595 F.Supp. at 1399; *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 501 A.2d 1239 (Del. Ch. 1985); *Shapiro v. Pabst Brewing Co.*, No. 7339, slip op. at 10 (Del. Ch. Feb. 5, 1985) [available on WESTLAW, 1985 WL 11578]. To state an individual and not a derivative claim, a plaintiff must allege either an injury separate and distinct from that shared by other shareholders or a wrong concerning a contractual right as shareholder. *Lipton,* 514 A.2d at 1078. *See also Kalmanovitz,* 595 F.Supp. at 1399; *Crane Co. v. Harsco Corp.*, 511 F.Supp. 294, 304 (D.Del.1981). Plaintiffs rely upon *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769, 777 (Del. Ch. 1967), in which the court itself characterized the issue as "a case of a stockholder with a contractual right to assert voting control being deprived of that right by what is virtually a corporate legerdemain." Plaintiffs here have alleged neither a deprivation of their contractual rights as shareholders or an injury they suffered apart from other stockholders. In fact the class is composed of all shareholders.

The Court finds that Count III must be properly brought as a derivative claim. Although there is authority for the proposition that a Court may attempt to reconstitute the Count III class claim as a derivative claim, *see Crane,* 511 F.Supp. at 304–05, it declines to do so in this case. Plaintiffs' claim in Count III alleges:

¶ 102. Defendants owed fiduciary duties to shareholders that included a duty of care, loyalty, fair dealing, and candor.

¶ 103. Defendants breached these duties by causing GM to enter into a transaction for no legitimate business purpose, but rather for the sole or primary purpose of entrenching themselves and preventing Perot from criticizing GM and the director defendants. The purchase was an intentional act done without regard to the rights and interests of the shareholders. By dissipating and wasting substantial assets of GM to finance the transaction, the corporation reduced the value of plaintiffs' stock.

These claims against the directors are contained in the plaintiffs' derivative claims in Counts V and VI, in which they allege breach of fiduciary duty, waste of corporate assets and action by the directors for the improper purpose of entrenchment and silencing Perot's criticism. *See* ¶ 110–122. There is no need for the Court to reconstitute Count III.

Accordingly, Count III of the plaintiffs Second Amended Consolidated Complaint will be dismissed.[13]

### E. Counts V and VI—Derivative Claim of Waste and For Breach of Fiduciary Duty

■ Plaintiffs bring a derivative claim of waste in Count V, alleging that the price paid to Perot was grossly excessive and for an improper corporate purpose. Plaintiffs' Count VI derivative claim alleges the directors breached their fiduciary duties by purchasing Perot's stock for the primary purpose of entrenching themselves and to silence Perot in violation of "established public policy." ¶ 122. Plaintiffs have made a demand upon the GM Board which has been refused. ¶¶ 75, 76. Defendants assert the refusal of demand allegations contained in the complaint are legally insufficient and Counts V and VI should therefore be dismissed.

The Court will first address defendants' threshold assertion that the *Grobow* decision is res judicata on this action. The *Grobow* plaintiffs had not made a demand. The Delaware Supreme Court was concerned with the issue of whether there were sufficient facts alleged to excuse a demand. *Grobow v. Perot*, 539 A.2d 180, 183 (Del.1988). Under Delaware law, the factual allegations in a demand excused context must create a reasonable doubt of director disinterest or independence or of inapplicability of the business judgment rule. *Id.* This Court has before it a demand refused question to which the reasonable doubt standard does not apply. It follows the issue before the Delaware Supreme Court was not the same as before

this Court. *Grobow* does not have a res judicata effect on this action.

### 1. *The Business Judgment Rule and Self–Interest*

■ Under Delaware law, the business judgment rule operates as a presumption "that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow*, 539 A.2d at 187.

Plaintiffs may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984); *Solash v. The Telex Corp.*, No. 9518, slip op. at 20 (Del. Ch. 1988) [available on WESTLAW, 1988 WL 3587]. Directors act in self-interest if they appear on "both sides of the transaction, or ... [derive] any personal financial benefit from it which did not devolve upon the corporation and the shareholders generally." *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del. 1987). *See also Aronson*, 473 A.2d at 812. Plaintiffs have pleaded no facts to support a finding that the GM directors were on both sides of the purchase of Perot's stock, or that they derived any financial benefit different from that of other GM shareholders.

Given that self-interest was not sufficiently alleged, in order to overcome the presumption of the business judgment rule, plaintiffs must allege with particularity facts which establish that the contested decision was not a product of valid business judgment. *Allison v. General Motors*, 604 F.Supp. 1106, 1122 (D.Del.), *aff'd*, 782 F.2d 1026 (3d Cir.1985); *Grobow*, 539 A.2d at 187. They may do so by alleging fraud, bad faith or a grossly negligent failure to make an informed decision. *Allison*, 604 F.Supp. at 1122; *Grobow*, 539 A.2d at 187; *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985).

---

**13.** Count IV will be discussed following the derivative claims in Counts V and VI.

### 2. The Board's Refusal of the Demand

Under Federal Rule of Civil Procedure 23.1, governing derivative actions by shareholders:

The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

Rule 23.1 requires a plaintiff to go beyond the notice pleading requirement. The plaintiff must make particularized allegations. *Allison,* 604 F.Supp. at 1112. In a demand refused context, allowing general allegation by a plaintiff would undermine the purposes of Rule 23.1. *Lewis v. Hilton,* 648 F.Supp. 725, 727 (N.D.Ill.1986). Delaware law governs this Court's determination of whether plaintiffs have overcome the presumption of the business judgment rule. *Allison,* 604 F.Supp. at 1120.

If a board's refusal to sue on a derivative claim is protected by the business judgment rule, the plaintiff lacks the authority to pursue a derivative action on the corporation's behalf. *Levine v. Smith,* No. 8833, slip op. at 4 (Del. Ch. Dec. 22, 1987) [available on WESTLAW, 28885] (citing *Aronson v. Lewis,* 473 A.2d 805, 813 (Del.1984); *Zapata Corp. v. Maldonado,* 430 A.2d 779, 784 (Del.1981)). When the Board has refused a demand, the threshold burden is on the plaintiffs to rebut the presumption of the business judgment rule. *Allison,* 604 F.Supp. at 1122; *Levine,* slip op. at 4.

Plaintiffs' complaint does not include any facts to support a conclusion that the directors acted fraudulently or in bad faith. However, plaintiffs assert the directors did not adequately inform themselves prior to refusing the demand. In order to receive the protection of the business judgment rule, prior to making a decision, directors have a duty to inform themselves "of all material information reasonably available to them." *Aronson,* 473 A.2d at 812. Under Delaware law, a court must employ a gross negligence standard in determining whether the board's decision was in informed one. *Smith,* 488 A.2d at 873; *Aronson,* 473 A.2d at 812. To state a claim of gross negligence, plaintiffs must allege facts to support the conclusion that the Board acted with so little information that their decision was "unintelligent and unadvised," or outside of "the bounds of reason and recklessly." *Smith,* 488 A.2d 873 & n. 13.

GM's letter rejecting the demand, attached to the complaint, indicates the Board reviewed the issues raised in the letter of demand.[14] Plaintiffs, however,

---

**14.** The text of the letter of demand sent to GM's Board of Directors on January 12, 1987 is as follows:

I am writing to you on behalf of Barbara Zarowitz and other clients of our firm who are and have been shareholders of the Company at all relevant times.

On behalf of our clients, I hereby demand that the Company take prompt legal action to rescind the transactions pursuant to which a former director, Mr. H. Ross Perot, was paid in excess of $700 million prematurely to silence and to prevent him from taking steps which were constructive and in the best interest of the Company and its shareholders. Alternatively, if you do not take the foregoing action, and in light of the substantial waste of corporate assets and breach of fiduciary duty on the part of each of you, I hereby demand that the Company promptly commence legal proceedings against each of you to recover its damages.

I shall look forward to hearing from you within the next thirty days.

The text of the Board's reply on February 6, 1987, is as follows:

Please be advised that on February 2, 1987, following review of the matters set forth in your January 21, 1987 letter, the Board of Directors of General Motors Corporation unanimously determined that an attempt to rescind, or litigation, or other action concerning the transaction involving the purchase of General Motors Class E stock and related contingent notes from H. Ross Perot, is not in the best interests of the Corporation. Accordingly, the Board refused your demands.

Both of these letters were referred to as attached in ¶ 76 of the Second Amended Consolidated Complaint, Dkt. 57, but were physically attached to the Consolidated Complaint, Dkt. 29. Although the Board's refusal letter was attached to the complaint, the Court does not consider the statement that the Board conducted a review to be a factual allegation of the complaint itself. At best, the refusal letter casts doubt on plaintiffs' allegations that there was no review. However, on a motion to dismiss, the allegations of the complaint must be accepted as true.

contend that the pertinent allegations in the complaint sufficiently allege the directors' refusal of their demand was grossly negligent. The relevant paragraphs of the Complaint read:

75. Demand has been made on the Board of Directors of GM and has been wrongfully refused.

76. Attached to this complaint is the demand made on behalf of Barbara Zarowitz and others, including Elliott Dubowski, one of the plaintiffs herein, and GM's response thereto. This demand was summarily rejected as were each of the other demands made by shareholders in the various lawsuits arising out of the Perot transactions.

77. Prior to rejecting plaintiffs' demand, GM's Board did not review its initial decision to ratify the Perot transaction nor did it constitute a special committee to investigate the matter. Therefore, the Board's rejection of the demand was based upon the same misinformation and uninformed judgment as was the Board's approval of the Perot buyout. The rejection, as was the approval of the Perot transaction, was an uninformed director judgment and did not constitute an independent exercise of business judgment entitled to protection under the law.

78. Because the Board failed to conduct any inquiry in response to the shareholder demands made upon it or to appoint an independent committee to investigate the matter on its behalf, it compounded its initial error of ratifying the transaction without adequate information or consideration by wrongfully rejecting the shareholder demands made upon it.

On a motion to dismiss, all of the factual allegations contained in the complaint are assumed to be true. *Hughes*, 449 U.S. at 10, 101 S.Ct. at 176. The statements of wrongful refusal in paragraphs 75 and 76 are conclusory allegations without supporting facts and could not withstand a motion to dismiss. The allegations in paragraphs 77 and 78 tie the allegations of the Board's failure to inform itself concerning refusal of the demand to the Board's alleged failure to inform itself prior to its decision approving the transaction. However, the Court must determine that the Board's refusal of the demand is not protected by the business judgment rule before reaching the issue of the Board's approval of the transaction. *See Zapata*, 430 A.2d at 784 & n. 10. Therefore, the Court must consider the allegations as they relate solely to the Board's decision to refuse the demand.

Plaintiffs' complaint states the Board did not review its initial decision, form a special committee or make any inquiry in response to the demands. There is no requirement that the Board establish a special committee in a demand refused situation. However, the Board must properly inform itself prior to refusing the demand. The Complaint alleges that the Board neither reviewed its initial decision to approve the transaction nor made any inquiry in response to the demand letter. As alleged, the Board took no steps to obtain information prior to refusing the demand.

Plaintiffs have met the requirements of Rule 23.1 and may proceed with their derivative claims. The motion to dismiss with respect to Counts V and VI will therefore be denied.

F. Count IV—Class Claim for Breach of Fiduciary Duty—Limited Preferential Purchase Offer

■ In the Count IV class claim, plaintiffs contend that the director defendants breached their fiduciary duty by failing to extend the offer made to Perot and the other EDS officials to the rest of the GME stockholders. Plaintiffs allege they were harmed because they were unable to take advantage of the preferential offer.[15]

Absent an improper purpose, a corporation has the authority to repurchase its shares from a dissident stockholder. *Gro-*

---

**15.** Counts V and VI contain derivative claims alleging the stock purchase breached the directors' fiduciary duty. Count IV is distinguished as a class claim alleging harm to the shareholders as distinct from the corporation. *See infra* at Section II–D for discussion of the distinction between individual and derivative claims.

bow v. Perot, 539 A.2d 180, 189 (Del.1988); Polk v. Good, 507 A.2d 531, 536 (Del.1986); Cheff v. Mathes, 199 A.2d 548, 554 (Del. 1964); Martin v. American Potash & Chemical Corp., 92 A.2d 295, 301 (Del. 1952); Kaplan v. Goldsamt, 380 A.2d 556, 569 (Del. Ch. 1977). The plaintiffs rely upon Fisher v. Moltz, 5 Del.J.Corp.L. 530 (Del. Ch. 1979), published in 5 Del.J.Corp.L. 530 (1980), for the proposition that the burden of proving a proper corporate purpose is on the corporation when the offer is made to some shareholders but not others. In Fisher, the Chancery Court was concerned with a corporation's selective tender offer to repurchase the shares of some but not all of its former employees. Id. See also Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 958 n. 14 (Del.1985); Mesa Petroleum Co. v. Unocal Corp., No. 7997, slip op. at 19 (Del. Ch. May 13, 1985) (under Fisher, business judgment rule not applied in selective tender offers). In Unocal, the Delaware Supreme Court held that, in the context of a takeover, "there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." 493 A.2d at 954. As the Court found infra, the Board's offer to purchase the shares of Perot and the three other EDS shareholders was not a tender offer. GM was not attempting a takeover of EDS, which was already merged with GM. Plaintiffs do not benefit from the Unocal enhanced duty of care when the Court reviews GM's repurchase of its shares from Perot and the others. See Grobow, 539 A.2d at 188 (distinguishing Unocal).

Although the Delaware Supreme Court did not specifically address the issue of the corporation's burden of proving a proper corporate purpose when it considered the Perot/GM transaction, it placed the burden on the plaintiffs to plead facts that the business judgment rule should not apply. See Grobow, 539 A.2d at 189. This Court therefore anticipates that the Delaware Supreme Court would not impose the burden of proving a proper corporate purpose upon a defendant corporation or its directors if a corporation selectively repurchases its shares outside of the tender offer context.

Even if the plaintiffs could overcome the presumption of the business judgment rule, aside from Fisher which applies in the context of a takeover, no Delaware law exists to support plaintiffs' contention that the director defendants had a duty to extend the same offer to all GME shareholders. In Martin, the Delaware Supreme Court found that a corporation was not required to extend the same offer to all holders of the affected class of stock when it repurchased shares for retirement. 92 A.2d at 300–01. Because the Delaware Supreme Court in Grobow did not have before it the issue of a corporation's duty to extend the same offer to all shareholders, this Court must predict how the Delaware courts would respond. Finding nothing unique about the Perot/GM transaction, this Court concludes the Delaware courts would not impose such a duty in the factual context of this case. Plaintiffs have not stated a claim under Delaware law and Count IV will be dismissed.

## G. Claims Against Perot

Because plaintiffs have not stated a claim under Rule 10b–5 nor under the Williams Act, these claims must be dismissed as to Perot as well as the director defendants. In addition, the Court has dismissed Count III because it must be brought s a derivative claim and therefore it too is dismissed as to Perot. Counts IV and VI do not name Perot as a defendant. Count V asserts claims against Perot as a director and as an aider and abettor. Based on its findings that plaintiffs have made sufficient allegations to withstand the challenge to Count V, Perot remains as a defendant in Count V.

## III. Summary

All of the Counts that are dismissed below are dismissed with prejudice. Plaintiffs have had full opportunity to amend their complaint. Prior to the Court's approval of the plaintiff's motion to amend, they represented to the Court that the Second Amended Consolidated Complaint con-

tained all relevant information concerning application of the business judgment rule, including that gleaned from discovery in the New York state court *Hart* litigation, and that without further discovery no additional facts would be available. Dkt. 56 at 11.

1. Count I, a Rule 10b–5 claim against all defendants, will be dismissed.

2. Count II, a claim for violation of the Williams Act against all defendants, will be dismissed.

3. Count III, a class claim for breach of fiduciary duty against all defendants, will be dismissed.

4. Count IV, a class claim for breach of fiduciary duty against the director defendants, will be dismissed.

5. Count V, a derivative claim against the director defendants and Perot as director and an aider and abettor, will remain.

6. Count VI, a derivative claim against the director defendants, will remain.

An order will be entered in accordance with this opinion.