Israel SHURKIN, On Behalf of Himself and All Others Similarly Situated, Plaintiff,

v.

GOLDEN STATE VINTNERS INC., Jeffrey J. Brown, Jeffrey B. O'Neill Acquisition Co., LLC, and Hank Uberoi, Defendants.

No. C04–03434 MJJ.

United States District Court, N.D. California.

Dec. 30, 2006.

Dennis J. Herman, Willow E. Radcliffe, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA, Darren J. Robbins, William S. Lerach, Tricia Lynn McCormick, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, for Plaintiff.

Dylan B. Carp, Kirkpatrick & Lockhart Preston Gates Ellis LLP, San Francisco, CA, Jonathan M. Cohen, Winston & Strawn LLP, San Francisco, CA, William N. Hebert, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Palo Alto, CA, for Golden State Vintners, Inc.

C. Brandon Wisoff, Farella Braun and Martel LLP, San Francisco, CA, for Jeffrey J. Brown and John G. Kelleher.

Christin R. Chobot, Jonathan C. Dickey, Michael B. Smith, Palo Alto, CA, Paul J. Collins, Gibson, Dunn Crutcher LLP, Palo Alto, CA, for Jeffrey B. O'Neill and O'Neill Acquisition CO. LLC.

Steven Sherr, Howard, Rice, Nemerovski, Canady, Falk, San Francisco, CA, for Hank Uberoi.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

JENKINS, District Judge.

Pending before the Court are: (1) Defendants Golden State Vintners, Inc. ("GSV" or "the Company"), Jeffrey J. Brown, Jeffrey B. O'Neill, John G. Kelleher and O'Neill Acquisition Co., LLC's ("the O'Neill Group" or "OAC") Motion to Dismiss (Doc. # 40); and (2) Defendant Frank Uberoi's Motion to Dismiss (Doc. # 39)[1] Plaintiff's Amended Class Action Complaint for Violation of the Federal Se-

---

1. For the purposes of judicial economy, the    Court addresses both motions in this Order.

curities Laws. Plaintiff Israel Shurkin has filed Oppositions to both Motions, to which Defendants filed Replies. For the following reasons, the Court **GRANTS** Defendants' Motions and dismisses Plaintiff's Amended Complaint **WITHOUT PREJUDICE**.

## I. BACKGROUND

### A. The Parties

Plaintiff brings this lawsuit on behalf of himself and as class representative for a purported class of all purchasers of GSV stock between December 23, 2003 and April 23, 2004, asserting claims against Defendants for violations of sections 10(b), 20A, and 20(a) of the Securities and Exchange Act of 1934 ("the Act"), and Rule 10–5 promulgated thereunder. Simply stated, Plaintiff alleges that Defendants employed a scheme to take GSV private at an artificially deflated price by misleading investors about the Company, and when that scheme was derailed by The Wine Group's ("TWG") competing acquisition offer, concealed the ensuing bidding war for control of GSV. (Amend.Compl.¶ 2.)

Defendant Jeffrey Brown was chairman of GSV's Board of Directors from April 1995, until TWG purchased GSV in July 2005. Defendant Jeffrey O'Neill was President, CEO, and a director of GSV prior to its sale to TWG. Defendant John Kelleher was GSV's CFO and Secretary prior to its sale to TWG. Defendant O'Neill Group is a California limited liability company that Defendant O'Neill organized. The associates/members of the O'Neill Group include Mr. O'Neill, Paul Violich, Peter Sterling, Peter Mullin, Scott Seligman, Doug Bratton, William Hallman, and Defendant Hank Uberoi.

### B. The Amended Complaint

Plaintiff's Amended Complaint alleges as follows:

### 1. Factual Background

Prior to July 2004, Golden State Vinters, Inc. ("GSV") was a California-based vintner and supplier of bulk wines, wine processing and storage services, and case goods, doing business through out the country. (*Id.* ¶ 2.) Particularly, GSV sold alcoholic beverages and related products in five operating segments: bulk wines, case goods, wine grapes, brandy, and ready-to-drink ("RTD") beverages. (*Id.* ¶ 26.) Based on its quarterly and annual SEC filings, GSV traditionally earned most of its income in the first half of its fiscal year, with 40 percent or more of its sales typically coming in the second quarter, which ended on December 31st. (*Id.* ¶ 28.)

According to Plaintiff, since GSV went public in 1998, GSV "appeared to be mired in a consistent downward sales trend, as exemplified by the decline in its second quarter revenues from $53.6 million in 2Q00, to just $31.1 million by 2Q03." (*Id.* ¶ 30.) Correspondingly, the price of GSV's stock declined from its 1998 initial public offering price of $17 per share, to $2 per share by FY03. (*Id.* ¶ 31.)

In 1999, GSV hired an investment bank, AH & H, to evaluate a potential merger or sale of the Company. (*Id.* ¶ 32.) But it did not identify any credible interest in GSV and failed to generate any firm proposals. (*Id.*) Although GSV received additional inquiries from prospective merger partners, GSV indicated that none of the inquiries resulted in any viable merger or acquisition proposals. (*Id.*)

Thereafter, in late 2002, GSV began investigating the "full range of strategic alternatives available to the Company." (*Id.* ¶ 33.) Toward this end, in January and February 2003, GSV received and evaluated memoranda from outside counsel detailing the available alternatives. (*Id.*) Later,

on March 3 and 4, 2003, GSV's Board, including Mr. O'Neill and Mr. Brown, met to discuss GSV's strategic options. (*Id.*) According to the December 23 Proxy, in light of the financial burdens of maintaining GSV's public company status, coupled with the continued challenges that GSV faced in the marketplace, the Board "generally concurred that a going private transaction might be a desirable strategic alternative to consider further, provided one could be proposed and effected at a price and on terms fair to all of [GSV's] stockholders." (*Id.*) The Board therefore instructed management to explore the feasibility and fairness of a going-private transaction. (*Id.*) GSV's Board met again on June 9 and 10, 2003, and discussed the financial burdens and competitive disadvantage of being a public company. Based on such factors, including "the lack of interest in any third party in a merger or acquisition," the Board requested that GSV's management propose a going-private transaction. (*Id.* ¶ 34.)

On July 15, 2003, GSV prepared a confidential term sheet outlining plans to take the Company private in a reverse 5,900 to 1 stock split, coupled with a $3.25 per share payment to holders of fractional interests. (*Id.* ¶ 35.) The following month, a special committee of outside directors hired AH & H to render a fairness opinion for the proposed going-private transaction. (*Id.* ¶ 39.) At this time, GSV's management provided AH & H with certain non-public financial projections on which to base their analysis of the fairness of the $3.25 per share price, including projected FY04 earnings of $2.7 million, based on $1.7 million in second quarter earnings and $1.1 million in combined third and fourth quarter loss. (*Id.*) According to Plaintiff, "Defendants deliberately caused AH & H's opinions to be prepared *before* [GSV]'s second quarter began, because they knew that any increased revenues earned during that quarter would require them to raise the acquisition price in the reverse split transaction above the $3.25 per share the Company could afford." (*Id.*) Further, Plaintiff alleges that "Defendants did not thereafter ask AH & H to update its opinion, even after second quarter revenues began coming in at increased levels that rendered the financial projections on which AH & H had based its opinion inaccurate and unreliable." (*Id.*)

On September 9, 2003, AH & H delivered its fairness opinion to GSV, wherein it opined that the $3.25 per share going private transaction was fair to GSV's shareholders. (*Id.* ¶ 40). In response, and upon the Special Committee's recommendation, GSV's Board approved the transaction. (*Id.*) The following day, on September 12, 2003, GSV issued a press release announcing the going-private transaction. (*Id.*) On that date, the $3.25 per share cash consideration represented a 56.3 percent premium over the $2.08 closing price of GSV's common stock on September 11, 2003—the last day of trading prior to the announcement. (*Id.* ¶ 41.) On September 15, 2003—the first day of trading following the announcement—GSV's stock price spiked, rising from $2.08 to $3.00 per share on greatly-increased trading volume. (*Id.* ¶ 42.)

On November 15, 2003, GSV published its initial proxy statement for the reverse stock split transaction, wherein GSV explained the mechanics of the transaction, the reasons prompting the transaction, and why it was fair to the stockholders. (*Id.* ¶ 43.) In particular, the initial proxy stated that one of the reasons for the transaction was the lack of any viable alternatives, including the lack of any potential merger or acquisition partner with an interest in acquiring GSV, and the Company's Class A shareholder's lack of interest in increasing their investment in GSV. (*Id.*) GSV

subsequently amended the proxy on December 2, 9, and 16, 2003, before it became effective on December 23, 2003. (*Id.* ¶ 44.)

## 2. Defendants' Alleged Scheme To Defraud

According to Plaintiff, "[f]rom mid–2002 through 2003, as efforts to privatize the Company escalated, [D]efendants repeatedly tried to deflate the value of its ready to drink ('RTD') business, including a $10 million high speed bottling line that had been purchased and installed at [GSV's] Reedley facility in the fourth quarter of 2001." (*Id.* ¶ 45.) Particularly, Plaintiff alleges that, based on statements from former GSV employees who worked in the RTD line, "O'Neill and other members of senior management deliberately ignored numerous opportunities to expand that business, and then intentionally overstated a write-down taken in 3Q03 based on the loss of two customers and the purported lack of new customers for the high-speed bottling line." (*Id.* ¶ 46.) Plaintiff alleges that "Defendants used the loss of business from these two customers to write off $8 million of [GSV]'s investment in the bottling line in the third quarter of fiscal year 2003," which, in turn, caused GSV to report a FY03 net loss of $4.3 million. (*Id.* ¶¶ 46–47.) Plaintiff alleges that, according to Confidential Witness 1 ("CW1"), the write-down was overstated, and did not accurately reflect the loss GSV incurred when it lost the business from its two largest customers because there were many additional customers eager to use the bottling line at the time the write-down was taken.[2] (*Id.* ¶ 47.) Plaintiff also alleges that based on statements from Confidential Witness 2 ("CW2"), GSV failed to pursue leads for new customers and failed to pursue other profitable business opportunities. (*Id.* ¶¶ 48–51.) Additionally, Plaintiff alleges that Confidential Witness 5 ("CW5") stated that, "based on the information s/he learned from working in the accounting department for more than five years, s/he came to believe that O'Neill and Kelleher 'did things to deflate [GSV's] stock price' to support their buyout attempt, including by writing off the value of the RTD bottling line." (*Id.* ¶ 52.) Particularly, Plaintiff alleges that CW5 said that despite the availability of other customers ready to provide business for the RTD line, GSV declined to pursue these business prospects. (*Id.*)

Plaintiff also alleges that according to the confidential witnesses, GSV deliberately reduced the amount of business from its existing customers by slowing down production and lowering production numbers, even in the face of a high product demand. (*Id.* ¶ 53.) Plaintiff alleges that GSV also understated these production numbers in its report to the federal Bureau of Alcohol Tobacco and Firearms ("ATF"). He

---

**2.** The AC relies on accounts by several Confidential Witnesses ("CW"). CW1 worked as a financial analyst and accountant for GSV and TWG from 2002 to 2004 and reported to the GSV treasurer and corporate controller who both reported to Kelleher. CW2 worked as a former business development manager in GSV's case goods and RTD lines from mid 2002 to early 2003 and reported to the Vice President of Operations, who reported to O'Neill. CW3 was an inventory controller and distribution coordinator in the government compliance department for the RTD division from 2001 through early 2002 and reported to the Vice President of RTD operations and the plant manager. CW4 was an accountant in GSV's government compliance department in 2002 and reported to the corporate controller and vice president. CW5 was a GSV accounting supervisor from about 2001 to 2004. CW6 was the general manager of the RTD division in 2002 and early 2003 and reported to the Vice President of Operations who reported directly to O'Neill. Finally, CW7 was an accounting manager from about 2002 to 2004 and reported to the corporate controller.

claims "[t]hrough these and similar manipulations spanning a period of 18 months or more, [D]efendants succeeded in driving down the value of [GSV] and keeping it artificially low by the time they first sought to take [GSV] private, at a price of just $3.25 per share." (*Id.* at ¶ 57.)

### a. Defendants' Alleged Hiding of GSV's 2Q04 Financial Turnaround and Subsequent Bidding War

According to Plaintiff, just before Defendants were to implement their plan to privatize GSV at the artificially-deflated value, GSV's "core" business, namely its bulk wine and case goods sales, suddenly increased. (*Id.* ¶ 58.) Further, Plaintiff alleges that because this increase in sales had occurred immediately after the crush season in September, and before the holiday season, it was apparent at the time the December 23 Proxy became effective that the financial projections on which AH & H had based its fairness opinion were outdated and unreliable. (*Id.*) Particularly, Plaintiff claims that "[j]ust by comparing the actual results for the first half of FY04 with the projected results for the second half of the year, it was abundantly clear that [GSV] was going to far exceed the projections for its financial performance on which the fairness of the $3.25 reverse split price was premised[.]" (*Id.* ¶ 61.) However, Plaintiff alleges that because Defendants knew that disclosing GSV's improved performance would undermine their plan to take the Company private at $3.25 per share, Defendants deliberately failed to update their projections or the fairness opinion in the December Proxy. (*Id.* ¶ 64.) In this way, Plaintiff alleges that Defendants sought to conceal GSV's financial turn-around from shareholders, and to further their scheme to take control of GSV at an artificially-reduced price. (*Id.*) However, according to Plaintiff, Defendants' scheme was frustrated when

TWG offered to buy GSV for $5 per share on January 7, 2004—two weeks after the December 23 Proxy was issued. (*Id.* ¶ 65.) Plaintiff alleges that, in response, Defendants attempted to out-bid TWG. (*Id.*)

### 3. False and Misleading Statements During the Class Period

Plaintiff alleges the following statements and/or omissions by Defendants were false and misleading.

### a. The December 23, 2003 Proxy Statement

Plaintiff alleges that the December 23 Proxy was prepared by or under the direction of Mr. O'Neill and Mr. Kelleher, was signed by Mr. Brown on behalf of GSV, and became effective on December 23, 2003—the first day of the Class Period. (*Id.* ¶ 66.) The December 23 Proxy described Defendants' plans to privatize GSV through the reverse-split transaction, summarized the mechanics of the transaction, and advised investors that GSV recommended approval of the transaction. (*Id.*) According to Plaintiff, the December 23 Proxy was materially false and misleading at the time it was issued because: "(1) the value of [GSV]'s assets, as reflected therein, was deliberately understated as the result of the improper write-down of the Reedley [RTD] bottling line; (2) the December Proxy included 2Q04 financial projections that they knew were no longer valid; and (3) there was no basis for the opinion that the $3.25 per share price to be paid in the reverse split transaction was fair to unaffiliated shareholders, because that conclusion was based on the financial data and projections that [D]efendants knew were outdated and invalid." (*Id.* ¶ 67.) Plaintiff alleges that shareholders who sold shares following issuance of the December 23 Proxy based on the above

information, were misled, and incurred damages as a result.

### b. January 20, 2004 Press Release

On January 20, 2004, GSV issued a press release, wherein it indicated that it had indefinitely suspended the going-private proposal described in the December 30, 2003 Proxy Statement. (*Id.* at ¶ 94.) The Press Release further stated that, "[t]he Company's Board of Directors has determined that in light of recently improved business and market conditions it is in the best interest of stockholders to suspend the proposal in order to provide more time to fully evaluate current conditions and the potential implications for stockholder value." (*Id.*) The Press Release caused a significant increase in the volume of trading activity of GSV's common stock, with over 220,000 shares sold during the two trading days following the Press Release. Plaintiff alleges that the Press Release was false and misleading because "[t]he reverse slit was suspended as a result of The Wine Group's offer and O'Neill's competing bid, and *not* because business conditions had recently improved." (*Id.* at ¶ 96.) Additionally, Plaintiff claims that the Press Release was false and misleading because it characterized the action as merely a "suspension" of the reverse split, and did not disclose Defendants' true reason for the action, which was to allow the Company to analyze the undisclosed third-party offer, and to provide time for O'Neill to put together his competing bid and buy the undervalued shares from the unaffiliated investors. (*Id.* at ¶ 97.) Plaintiff alleges that "[t]he statement in the [P]ress [R]elease that Citigroup Global Markets [ ] had 'been retained to advise' the Company in connection with its alternatives" was similarly misleading, because it failed to disclose that, in reality, Citigroup had been retained specifically to evaluate the third party offer for the Company, and weeks

before the [D]efendants seized on improved business conditions as the purported reason for suspending the reverse split transaction." (*Id.*)

### c. The 2004 10–Q Report

On February 18, 2004, GSV filed its Form 10–Q with the SEC. (*Id.* at ¶ 108.) The Form 10–Q reported that the value of GSV's property, plant, and equipment had declined to $56.236 million by the end of the second quarter. (*Id.* at ¶ 109.) The only statement in the Form 10–Q regarding the reverse split transaction or any pending merger or acquisition activities was:

On September 12, 2003, we announced that our Board of Directors had approved a 1 for 5,900 reverse split of each of out shares of Class A and Class B common stock with the intention to take us private. On January 20, 2004, we announced that we had indefinitely suspended, until further notice, the going private proposal described in out definitive proxy statement dated December 30, 2003. As more fully described in the proxy, the proposal called for a 1 for 5,900 reverse split of the Company's Class A and Class B common stock at a price of $3.25 per share. The Company's Board of Directors determined that in light of recently improved business and market conditions it was in the best interest of stockholders to suspend the proposal in order to provide more time to fully evaluate current conditions and the potential implications for stockholder value. Citigroup Global Markets Inc. has been retained to advise the Company in connection with its alternatives.

The Annual Meeting of the Stockholders was held on February 5, 2004 as planned. The stockholders approved the election of directors and the ratification of Deloitte & Touche LLP as the

Company's independent auditors. The vote on the reverse stock split was indefinitely suspended until further notice as described above.

(*Id.* at ¶ 110.) Plaintiff alleges that "[t]he proposals made by and bidding war between The Wine Group and the O'Neill Group were not revealed in the 2Q04 Form 10–Q or any other prior or contemporaneous public disclosure of information." (*Id.* at ¶ 111.) He claims that the February Form 10–Q was materially false and misleading at the time it was issued because it continued to under-report the value of GSV's assets by reflecting the improper write-down of its high-speed bottling facility, it misled investors as to the true reasons for the suspension of the reverse split transaction, and because it misleadingly characterized it as a "suspension" rather than a "cancellation" of that transaction. (*Id.* at ¶ 112.) Additionally, Plaintiff alleges that the Form 10–Q misled investors because it failed to disclose the existence of the competing proposals by the O'Neill Group and TWG to acquire the Company, or that the bidding war had continued to escalate, inflating the value of the Company. (*Id.* at ¶ 113.)

### d. The February 24, 2004 and March 8, 2004 Press Releases

On February 24, 2004, GSV issued a press release indicating that it had received two proposals to acquire the Company, including one from the O'Neill Group. (*Id.* at ¶ 116.) The February 24 Press Release also explained that GSV's Board of Directors had been in discussions with the potential acquirers regarding the proposals, and was going to continue to evaluate the proposals, as well as other alternatives available to GSV. (*Id.*) Following the February 24 Press Release trading volumes in GSV stock rose, and the stock price increased from $4.75 per share to $5.27 per share, before closing at $4.90 per share. (*Id.* at ¶ 117.)

Subsequently, on March 8, 2004, GSV issued a press release announcing that it had entered into a merger agreement with the O'Neill Group. (*Id.* at ¶ 118.) The Press Release stated that, under the terms of the agreement, each outstanding share of GSV's Class A and Class B Common Stock was entitled to receive merger consideration of $6.85 per share. (*Id.*) Following the issuance of the March 8 Press Release, the price of GSV's stock rose from $6.42 per share, to $6.76 per share. (*Id.* at ¶ 119.)

Plaintiff alleges that both press releases are false and misleading because "[n]either the February 24, 2004 or March 8, 2004[P]ress [R]eleases, nor any other contemporaneous public statements, fully disclosed the extent of the bidding war then being waged over control of the Company." (*Id.* at ¶ 120.) Specifically, Plaintiff charges that "[t]he [R]eleases did not identify The Wine Group as the competitive bidder, did not disclose the dates or amounts of the prior bids, and did not otherwise reveal the potential for further price increases as a result of the hotly contested bidding war that had erupted between the Company's management and one of its well-capitalized competitors." (*Id.*) Instead, Plaintiff alleges that "based on the public statements through March 8, 2004, investors had been told only that: (i) plans to take the Company private for $3.25 per share had been put on hold on January 20, 2004 due to recently improved business conditions; (ii) two proposals to acquire the Company, including one from O'Neill, had been made around February 24, 2004; and (iii) the Company had agreed to O'Neill's proposal, at a price of $6.85 per share." (*Id.*)

### 4. The Bidding War Between TWG and OAC

According to Plaintiff, on January 7, 2004, TWG—GSV's competitor—offered to buy the Company for $5 per share. (*Id.* at ¶ 65). Plaintiff alleges that immediately after TWG's made its offer, O'Neill formed OAC to outbid TWG for GSV. (*Id.* at ¶ 103) According to Plaintiff, two members of OAC—Uberoi and Bratton—began buying GSV shares on the open market that they had agreed to contribute to OAC to further OAC's efforts to outbid TWG.[3] (*Id.* at ¶ 104).

On January 25, 2004 OAC offered to buy GSV for $6 per share, which it raised to $6.10 per share by February 24, 2004. (*Id.* at ¶ 113–115.) At the time it raised its offer to $6.10, OAC held 52.7% of the outstanding shares of GSV Class B common stock.[4] (*Id.* at ¶ 115.) On March 8, 2004, GSV announced it entered into a merger agreement with OAC that would be completed in June 2004. (*Id.* at ¶ 118.)

TWG responded with another offer of $7.25 per share. (*Id.* at ¶ 124.) Two days later, GSV formally notified OAC of the offer and on March 17, 2004, TWG disclosed in a press release that TWG was also attempting to acquire GSV. (*Id.*) At this time GSV notified OAC that the Company was prepared to terminate the OAC merger agreement in favor or TWG's bid. (*Id.*) On March 22, 2004, OAC matched TWG's $7.25 offer, and the next day GSV authorized the execution of a revised merger agreement with OAC. (*Id.* at ¶ 126.) On March 24, 2004, GSV issued a press release announcing that the Company would continue with the OAC merger and TWG issued a press release announc-ing it was withdrawing its bid. (*Id.* at ¶ 127–28.) On March 25, 2004, the price of GSV's stock dropped from $7.40 per share to $7.17 per share, on an increased volume of 100,900 shares. (*Id.* at ¶ 129.)

On April 4, 2004, TWG reemerged in the bidding process and offered GSV $7.75 per share. (*Id.* at ¶ 130.) On April 9, 2004, GSV issued a press release announcing that it had received an offer from TWG to acquire GSV for $7.75 per share. (*Id.* at ¶ 130.) Following the Release, the price of GSV stock rose from $7.21 per share, to $7.76 per share. (*Id.* at ¶ 131.) On April 13, 2004, OAC increased its offer to $7.80 per share. (*Id.* at ¶ 132.) GSV issued a Release indicating that it had amended the Merger Agreement with OAC to reflect the new offer. (*Id.* at ¶ 132.) On April 16, 2004, TWG increased its bid to $8.25 per share. (*Id.* at ¶ 133.) GSV issued a Press Release announcing that it had received a new buyout offer from TWG to acquire the Company at $8.25 per share, which the Board determined was superior to the Merger Agreement with OAC. (*Id.*)

Plaintiff claims that on April 22, 2004, O'Neill gained control of the Reedley facili-ties, including the high-speed bottling line "through a series of transaction and agree-ment involving [TWG], SBIC, Brown and others." (*Id.* at ¶ 134.) According to Plaintiff, "[i]mmediately after that agree-ment was reached, O'Neill caused the O'Neill group to drop out of the bidding war for [GSV], and [GSV] signed a merger agreement with [TWG]." (*Id.*)

Following announcement of the agree-ment, the price of GSV stock fell from $8.45 per share—the Class Period high—on April 22, 2004, to close at $8.19 per

---

**3.** Between January 7, 2004 and January 21, 2004, Uberoi increased his GSV holdings by approximately 36 percent. (*Id.* at ¶ 105). Bratton, on the other hand, did not hold any shares prior to this time.

**4.** GSV Class A common stock was not public-ly traded.

share on April 23, 2004. (*Id.* at ¶ 135.) Thereafter, GSV's stock continued to trade at between $8.15 and $8.25 per share until the merger with TWG was completed on July 14, 2004. (*Id.*) The merger closed on July 14, 2005, with the payment of $8.25 per share to GSV's non-affiliated stockholders. (*Id* at ¶ 138.)

### C. Procedural History—Defendants' First Motion to Dismiss

Plaintiff filed his original Complaint on August 19, 2004. On August 10, 2005, the Court granted Defendants' Motion to Dismiss the Complaint. Specifically, as to Plaintiff's First Cause of Action for violation of section 10(b) and Rule 10b–5, the Court found that Plaintiff failed to plead falsity with sufficient particularity or facts supporting a strong inference of scienter. With respect to the December 2003 Proxy, the Court found that Plaintiff had not sufficiently pled that the $3.25 per share opinion was objectively false or misleading. Particularly, the Court rejected Plaintiff's argument that certain later-revealed facts supported Plaintiff's falsity allegation. The Court further agreed with Defendants that Plaintiff had failed to plead facts raising a strong inference that any defendant acted with scienter in issuing the December Proxy. Accordingly, the Court held that Plaintiff's allegation that the fairness opinion was false and misleading was subject to dismissal under the Private Securities Litigation Reform Act.

With respect to Plaintiff's allegation that Defendants' stated reasons for the reverse stock split proposal (that the company would save more than $900,000 a year in reporting-related expenses) were misleading, the Court found Plaintiff's allegations as to falsity and scienter insufficient. Reviewing Plaintiff's Complaint, the Court found that he had failed to allege facts to support the allegation that, in December

2003, Defendants' plan was to artificially deflate the value of GSV so that they could purchase the Company at a reduced price and benefit from the Company's increased earnings.

Next, the Court analyzed Plaintiff's allegation that Defendants' failure to disclose the January 7, 2004 third-party offer from the TWG to buy GSV for a minimum $5 per share was false and misleading. Plaintiff alleged that the third-party offer thwarted Defendants' attempts to take the Company private and that Defendants concealed the offer from the public so they could modify their plan to acquire the Company in a management-led buyout. Defendants argued that Plaintiff had not pled the falsity of this omission with sufficient detail. Particularly, they asserted that, absent allegations that Defendants owed Plaintiff a duty to disclose the offer, Defendants' silence was not misleading. The Court agreed, finding that because Plaintiff did not allege that Defendants ever represented to the public that no merger or acquisition was imminent, Defendants had no duty to disclose the offer. Accordingly, the Court dismissed the claim to the extent it was premised on Defendants' purported failure to disclose the January 7, 2004 offer.

Next, the Court evaluated the sufficiency of Plaintiff's allegations regarding GSV's January 20 Press Release. Plaintiff alleged that Defendants misled shareholders when they explained in the January 20 Press Release that the Company was suspending the going-private scheme due to "recently improved business and market conditions." According to Plaintiff, Defendants actually suspended the reverse stock split scheme because their plans to take the Company private for $3.25 per share were being foiled by the third-party offer from the TWG and they wanted to delay the selling process long enough to ensure

that OAC could come up with the premium offer. The Court found that Plaintiff failed to plead any facts that Defendants suggested in their January 20 Press Release that no merger or acquisition was imminent, or that any reason provided for the suspension of the going-private scheme was untrue. Accordingly, the Court held that Plaintiff failed to satisfy the pleading requirements of the PSLRA with respect to his allegation that the January 20 Press Release was designed to mislead.

As to Plaintiff's Second Cause of Action for violation of § 20(a) of the Securities and Exchange Act, the Court held that because Plaintiff failed to plead an underlying 10(b) violation, his section 20(a) claim failed as a matter of law.

Finally, the Court granted Defendants' Motion with respect to Plaintiff's Third Cause of Action for insider trading in violation of section 20A against Defendant OAC. Plaintiff had alleged that OAC engaged in illegal insider trading during the class period because members of the OAC—Uberoi and Bratton—bought 176,-580 shares of GSV stock on the open market after TWG made its $5.00 per share offer, but before the public knew about the offer. The Court dismissed the claim on the ground that Plaintiff failed to adequately plead a predicate section 10(b) violation, and because Plaintiff had failed to plead the link between Defendant O'Neill and purchasers Uberoi and Bratton.

The Court granted Plaintiff's request for leave to amend to cure these deficiencies. On September 23, 2005, Plaintiff filed the Amended Complaint.[5]

**D. Claims in the Amended Complaint**

In his Amended Complaint, Plaintiff alleges that because GSV falsely reported information with respect to the Company's financial condition, performance, growth, operations, and current and future business prospects, the price of GSV common stock was deflated during the class period. Consequently, Plaintiff asserts a Section 10(b) violation against Defendants GSV, Brown, O'Neill, and Kelleher; Sections 20A and 10(b) violations against Defendants O'Neill, Uberoi, and OAC; and Section 20(a) violation against Defendants Golden State, Brown, O'Neill, Kelleher, and the O'Neill Group.

Defendants now move to dismiss the Amended Complaint on the ground that Plaintiff has failed to plead fraud with the required particularity or to state a claim upon which this Court may grant relief.

**II. LEGAL STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Because the focus of a 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the Court ordinarily limits its review to the face of the complaint. *See Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002). Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or failed to allege sufficient facts under a cognizable legal theory. *See SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.,* 88 F.3d 780, 782 (9th Cir.1996); *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir.1984). Further, dismissal is appropriate only if it appears beyond a doubt

---

**5.** In the Amended Complaint, Plaintiff named Uberoi as a defendant and re-alleged his three claims in his initial Complaint.

that the plaintiff can prove no set of facts in support of a claim. *See Abramson v. Brownstein,* 897 F.2d 389, 391 (9th Cir. 1990). In considering a 12(b)(6) motion, the Court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir.2000).

## III. DISCUSSION

### A. Requests for Judicial Notice

█ As a threshold matter, the Court considers Defendants' request for judicial notice. Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994).

Defendants request that the Court take judicial notice of various documents GSV filed with the SEC, including a Form 10–K/A for Fiscal Year Ended June 30, 2003; a Form 10–K/A for Fiscal Year Ended June 30, 200; a Form 10–K for Fiscal Year Ended June 30, 1999; and a Form 10–Q for quarterly period September 30, 2003. Defendants assert the documents are matters of public record whose contents are explicitly relied on in the Amended Complaint. Defendant Uberoi also requests the Court take judicial notice of several documents filed with the SEC, including Schedule 13D of O'Neill, Paul Violech, Uberoi, Sterling Management Trust, Peter Mullin, Scott Seligman, Doug Bratton and William Hallman, filed with the SEC on

February 26, 2004; Amended Schedule 13D of O'Neill, Violich, Uberoid, Sterling Management Trust, Mullin, Seligman, Bratton and Hallman, filed with the SEC on March 17, 2004; and Schedule 13G of Uberoi, filed with the SEC on January 23, 2004.

Plaintiff opposes both requests. Plaintiff objects insofar as Defendants seek to have the Court take judicial notice of the *truth or accuracy* of the documents. Plaintiff acknowledges that the Court may take judicial notice of documents upon which the complaint necessarily relies and the authenticity of which is not disputed and of documents generally known within the community whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201(b); *Lee v. City of Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001). Nonetheless, Plaintiff argues the Court should not take judicial notice of some of the documents.

"In a securities action, a court may take judicial notice of public filings when adjudicating a motion to dismiss...." *In re Calpine Corp. Sec. Litig.,* 288 F.Supp.2d 1054, 1076 (N.D.Cal.2003). Accordingly, the Court takes judicial notice of these documents, not for the truth of the statements contained therein, but for the fact that these documents that were publicly-filed and for the fact that the statements made therein were made to the public on the dates specified.

### B. Plaintiff's First Cause of Action Against GSV, Brown, O'Neil, and Kelleher for Violation of Section 10(b) of the Securities Exchange Act and Rule 10b–5

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any secu-

rity not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Relatedly, Rule 10b–5 makes it unlawful for any person to use interstate commerce

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

For a claim under § 10(b) and Rule 10b–5 to be actionable, a plaintiff must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir.1999). Concomitantly, as indicated above, pursuant to Federal Rule 9(b), to survive dismissal, Plaintiff must plead both the falsity and scienter elements with particularity. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001). As the Ninth Circuit explained:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u–4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6),

> [the court] must determine whether 'particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.' Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).

*Id.* (citations and internal quotation marks omitted).

Furthermore, in 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104–469, 104th Conf., 1st Sess. at 32 (1995) (Nov. 28, 1995). The PSLRA strengthened the pleading requirements of Rules 8(a) and 9(b). Actions based on allegations of material misstatements or omissions under the PSLRA must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b–5. Specifically, the PSLRA imposed strict requirements for pleading scienter. A complaint under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the

[PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir. 1999). If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. § 78u–4(b)(1).

In the Amended Complaint Plaintiff alleges four statements attributable to Defendants were false and misleading and that Defendants knew the statements were false or misleading at the time they were made. Plaintiff alleges: (1) in the December 23, 2003 Proxy Statement, Defendants materially understated the value of the RTD business based on false claims that it had no customers, Defendants materially understated financial projections, Defendants misstated that the $3.25 per share price for the reverse split price was fair to shareholders, and Defendants failed to update the proxy information; (2) in the January 20, 2004 Press Release, Defendants mislead investors about reasons for the suspension of the reverse stock split; (3) in the Second Quarter 2004 Form 10–Q Report, Defendants continued to mislead investors about GSV's value by delaying disclosure of the bidding war between TWG and OAC; and (4) in the February 24, 2004 and March 8, 2004 Press Releases, Defendants continued to mislead investors about GSV's value by failing to disclose material facts relating to TWG and OAC's competing bids. The Court will examine each of these in turn.

### 1. December 23, 2003 Proxy Statement

As in Plaintiff's initial Complaint, in the Amended Complaint Plaintiff alleges that GSV's December 23 Proxy Statement undervalued GSV's financial outlook by false-ly assuring shareholders that $3.25 per share was a fair price in the going-private transaction. Plaintiff alleges that when the proxy was disseminated, Defendants knew the GSV was on track to earn revenues that exceeded its annual projected earnings. Plaintiff also alleges Defendants engaged in a write-down scheme of the RTD bottling line which caused AH & H to underestimate GSV's potential revenues and value. Consequently, Plaintiffs assert that Defendants misrepresented to shareholders that $3.25 per share was a fair buy-out price with respect to the going private transaction.

In their Motion, Defendants argue that Plaintiff's allegations with respect to the December Proxy are insufficient to meet the pleading requirement of the PLSRA. Defendants also assert Plaintiff's allegations do not raise a strong inference of scienter. The Court agrees on both grounds.

### a. Falsity of the Fairness Opinion

■ A representation in a proxy statement that a proposed plan of action is "fair, from a financial point of view, to the shareholders" is a statement of opinion. *In re McKesson HBOC Sec. Litig.,* 126 F.Supp.2d 1248, 1265 (N.D.Cal.2000). To plead the falsity of a statement of opinion, a plaintiff must "plead with particularity why the statement of opinion was objectively and subjectively false." *Id.* A fairness opinion is "objectively false" if the subject matter of the opinion is not, in fact, fair, and is "subjectively false" if the speaker does not, in fact, believe the subject matter of the opinion to be fair. *Id.*

As detailed above, Plaintiff alleges that the December 23, 2003 Proxy undervalued GSV's existing and prospective financial condition by falsely assuring investors that $3.25 per share was a fair price in the going-private scheme based on financial

projections and a fairness opinion that Defendants purportedly knew were outdated and unreliable (AC at ¶¶ 58–89.) According to Plaintiff, by the time the Proxy became effective, Defendants were aware that GSV was on track to report revenue and earnings for the second quarter and fiscal year that substantially exceeded the revenue and earnings projected in the Proxy. (AC ¶¶ 59–64, 74–80.) Thus, Plaintiff argues that "[b]ecause [D]efendants knew the $3.25/share fairness opinion and the financial projections on which it was based both lacked a reasonable basis at the time the Proxy was issued, the Proxy was both objectively and subjectively false." (Opp. at 9.)

In support of its claim, Plaintiff proffers the following allegations. Plaintiff alleges that the majority of GSV's revenues came from bulk wine and case goods sales, the majority of which took place in the second quarter. Based in part on statements from CW3—an inventory controller and distribution coordinator in GSV's RTD division—Plaintiff alleges that GSV typically increased its second quarter case goods production so it could ship products by the end of October in anticipation of increased holiday sales. (AC ¶ 29.) Because GSV's second quarter production was font-loaded, Plaintiff alleges that "it is reasonable to infer that most of [GSV's] 2Q04 sales had already taken place and product had been shipped well before December 23, 2003, when the December Proxy became effective." (AC ¶ 77.) Plaintiff thus advances that "it is plain that the dramatic increase in second quarter sales occurred long before the Proxy was issued on December 23." (Opp. at 7.)

In the same vein, Plaintiff alleges that, in light of the dramatic increase in second quarter revenues, the financial projections in the Proxy were unreliable. According to Plaintiff, by the end of 2Q04, GSV had

earned $6.1 million, which was more than double the $2.7 million that the December Proxy stated would be earned in the entire fiscal year. (AC ¶ 78.) Plaintiff alleges that, although GSV had experiences losses in 3Q03 and 4Q02, those losses were the result of one-time events, not recurring seasonal losses. (AC ¶ 79.) Thus, Plaintiff claims that these losses did not provide an accurate prediction of GSV's anticipated results from operations in the second half of 2004. (*Id.*)

Relying on the foregoing allegations, Plaintiff asserts that "it was misleading for [GSV's] Proxy to publish the out-of-date financial projections, or rely on AH & H's fairness opinion that $3.25/share was a fair price that was in the best interest of [GSV's] unaffiliated shareholders, knowing it was based on out-of-date financial projections." Further, Plaintiff argues that because the fairness opinion and the Proxy indicated that AH & H based its assessment on currently available estimates and judgments of future financial projections, "the logical conclusion of a reader of the Proxy would be that the fairness opinion was not updated after September 11 because nothing had changed and no update was necessary." (Opp. at 8.) Plaintiff charges that, in failing to update the financial projections or the fairness opinion, or otherwise alert investors that the information was outdated and incorrect, Defendants acted fraudulently. (*Id.*)

As in their prior Motion to Dismiss, Defendants again attack the sufficiency of Plaintiff's allegations, arguing that Plaintiff has failed to plead facts to support his allegations that the statement in the Proxy that the $3.25 per share was a fair price for shareholders was false. For the reasons that follow, the Court agrees with Defendants.

To a large extent, Plaintiff's allegations in his Amended Complaint with respect to

the falsity of the fairness statement in the Proxy suffer from the same deficiencies as those in his initial Complaint. First, the fact that GSV "ramped up" production in the initial half of the second quarter so that the bulk of its earnings occurred during this time does not give rise to a strong inference that the statement in the Proxy that $3.25 was a fair price was false. Particularly, as Defendants note, Plaintiff's allegation that, during his employment CW3 witnessed GSV ramp up production, does not support the inference that GSV also increased production during the second quarter of FY04. In fact, Plaintiff concedes that CW3's employment ended before the Class Period and thus, CW3 lacks any personal knowledge as to the GSV's production activity during the 2Q04 that is at issue here.

Second, although GSV's second quarter earnings exceeded the initial projections, as Defendants point out, GSV's first half FY04 did not conclude until December 31, 2003, and GSV's actual second quarter results were not published until GSV filed its February 18, 2004 10–Q. Thus, *at the time AH & H issued its fairness opinion and at the time GSV issued its proxy,* GSV's second quarter performance had not concluded nor had its precise earnings been finalized. Moreover, as Plaintiff recognizes, GSV's 1Q04 earnings were lower than GSV anticipated. Given the unavailability of finalized second quarter figures, and the lower than expected earnings in the preceding first quarter, the Court finds that Plaintiff's allegations that the initial indications of higher than expected profits in the second quarter are insufficient to support Plaintiff's claim that the fairness statement in the Proxy was false or misleading.

**b. Improper Write–Down of the RTD Bottling Line**

■ In his Amended Complaint, Plaintiff alleges that the December Proxy materially understated the value of GSV's property, plant, and equipment because it was based on an inflated $8 million write-down of the Reedley bottling line in 3Q03. Plaintiff alleges that "the write-down was not caused by [GSV's] claimed 'inability to locate new customers,' but was instead part of [D]efendants' overall scheme to defraud the Company's unaffiliated shareholders by artificially devaluing [GSV] and its assets and diminishing its actual and anticipated financial projections." (AC ¶ 71.) According to Plaintiff, former GSV insiders have stated that Defendants "deliberately ignored or sabotaged efforts to enter into new contracts with new customers who expressed strong interest in using the RTD bottling line, even in the face of repeated inquiries from [GSV's] own sales personnel." (*Id.*) Additionally, Plaintiff alleges that "Defendants misled investors by undervaluing the value of its assets in violation of generally accepted accounting principles," and "materially understated its 3Q03 and FY03 financial performance, as well as its value under the comparable company, liquidation, and discounted cash flow analyses performed by AH & H." (*Id.*) Further, the Amended Complaint alleges that "[t]he December Proxy, and the FY03 Form 10–K incorporated therein by reference, also misrepresented the business prospects for the Reedley bottling line by falsely claiming that there was insufficient business to support the investment the Company had made in the line when, in fact, [D]efendants had deliberately ignored and refused to follow up on numerous inquiries from potential customers that would have allowed them to expand operations on the line[.]" (AC ¶ 72.)

Plaintiff claims the CW statements support these allegations, in that they indicate that "O'Neill and other members of the senior management deliberately ignored

numerous opportunities to expand [the RTD business], and then intentionally overstated a write-down taken in 3Q03 based on the loss of two customers and the purported lack of new customers for the high-speed bottling line." (AC ¶ 46.) The Court has reviewed the allegations based on Plaintiff's CW accounts and agrees with Defendants that the allegations lack particularized detail to support each witness's basis of knowledge. At most CW1, 2, 3, 5, and 6 offer their own assessment of the business decisions that GSV's directors made with respect to the RTD line. As Defendants correctly point out, none of the CWs indicate that he/she had first-hand knowledge about Defendants' decisions regarding pursuing potential business ventures and customers. Further, while the Confidential Witnesses may speculate that Defendants' underlying objective was to decrease the value GSV's shares by inhibiting the performance of the RTD line, none of the witnesses indicates that they were instructed by any Defendant to take such action or that any Defendant revealed such a motive. The fact that the CWs may be critical of Defendants' business decisions with respect to the RTD line based on their appraisal of the write-down and GSV's attempt to expand its customer base do not provide the level of particularity that would support an inference that Defendants deliberately understated the value of GSV' assets by fraudulently writing-down the value of the RTD line. The Court therefore finds that Plaintiff has failed to meet the heightened pleading requirement with respect to this statement.

### c. Scienter

■ Defendants contend that the Plaintiff has not raised a strong inference of scienter on behalf of any defendant. Defendants also assert that none of the CWs, whose accounts Plaintiff relies onto to establish the strong inference, have ever spoken directly to O'Neill or Kelleher. Plaintiffs counter that the aforementioned facts demonstrate a strong inference of scienter because they indicate GSV had undergone a substantial financial turnaround prior to the issuance of the December 23 Proxy Statement, which Defendants purposefully ignored.

The PSLRA requires securities fraud plaintiffs to plead "in great detail" that each defendant participated in making false or misleading statements of present or historical fact with either (1) actual knowledge that a statement being made is false, or (2) intentional recklessness to the truth of a statement at the time it is made. *In re Silicon Graphics*, 183 F.3d at 977. Such plaintiffs must allege facts that give rise to a "strong inference" of at least deliberate recklessness. *Id.* at 974. To satisfy the "strong inference" requirement, the Complaint must contain particularized " 'allegations of specific "contemporaneous statements or conditions" that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made.' " *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir.2003) (citing *Ronconi*, 253 F.3d at 432).

Even assuming, *arguendo*, Plaintiff's pled falsity with sufficient particularity, Plaintiff has not pled facts that give rise to a strong inference of scienter. Although Plaintiff asserts in conclusory fashion that Defendants knew the $3.25 per share price in the December 23 Proxy was incorrect because of GSV's alleged financial turnaround, Plaintiff has not pled specific statements or conditions that demonstrate Defendants knew the information provided in the December 23 Proxy was false or that Defendants deliberately disregarded the truth about GSV's financial status when the December Proxy was released.

Furthermore, as for the CW accounts, at best Plaintiff makes allegations that several GSV employees disagreed with the business decisions and financial reports of GSV upper management. The AC does not establish that the three CWs who were still working at GSV when Defendants decided on a reverse stock split and later released the December 23 Proxy Statement had any direct contact whatsoever with Defendants. Thus, not only do these allegations fail to establish that GSV was undergoing a substantial turn-around prior to or at the time the December Proxy Statement was released, they also fail to establish that statements in the December 23 Proxy Statement were false or that the officers who provided AH & H with information pertaining to the RTD write-down or the December Proxy Statement knew it to be false or were deliberately reckless in providing the information. *See, e.g., In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 355 F.Supp.2d at 1084 (N.D.Cal. 2005).

## 2. January 20, 2004 Press Release

Next, Defendants urge the Court to dismiss any claim based on the January 20 Press Release. In the Amended Complaint, Plaintiff alleges that the January 20 Press Release was false and misleading because: (1) "it characterized the action as a mere 'suspension' of the reverse split"; (2) "failed to disclose [D]efendants' true reasons for the action: to provide time for the Company to analyze the undisclosed third party offer and to provide time for O'Neill to put together his competing bid and snap up the undervalued shares in the Company from unsuspecting unaffiliated investors"; and (3) "[t]he statement in the press release that Citigroup Global Markets Inc. [ ] had 'been retained to advise the Company in connection with its alternatives' was similarly misleading because it failed to disclose that, in reality, Citi-

group had been retained specifically to evaluate the third party offer for the Company, and weeks before [D]efendants seized on improved business conditions as the purported reason for suspending the reverse split transaction." In their Motion, Defendants assert that Plaintiff had failed to adequately allege the falsity of these statements or scienter.

### a. Falsity

■ Defendants attack Plaintiff's allegations on two bases. First, they argue that the January 20 Press Release "did not merely advise investors that business conditions had improved; it expressly told investors it was considering strategic alternatives other than the going private transaction that had been suspended." Morever, the Press Release expressly indicated that GSV had hired an investment banker "to advise the Company in connection with its alternatives." Thus, Defendants argue that the Press Release adequately apprised the public of the status of the going-private transaction and the reasons for its suspension. Defendants therefore assert that Plaintiff has no basis to argue that a more complete disclosure was needed to prevent the December Proxy from being misleading.

They further argue that "the statement in the December 23 proxy—that one reason for the reverse split transaction was that there had been no expression of interest in acquiring the [C]ompany—became irrelevant when GSV announced in the January 20 Press Release that the reverse split transaction was *not* going forward and that other alternatives, which might be more favorable to stockholders in light of recently improved business and market conditions, were being considered with the assistance of an investment banker."

Second, Defendants argue that, as the Court held in its prior Order, GSV did not have any duty to disclose the third party offers. Specifically, they argue that the January 20 Press Release did not state or intimate that no merger was imminent or that GSV had received no expressions of interest as of January 20. Nor did the Release state that conditions were the same as those discussed in the December 23 Proxy. Defendants also argue that Press Release put the public on notice that GSV was considering other alternatives to the reverse stock split transaction.

Plaintiff responds that "[b]y affirmatively setting forth purported reasons for the indefinite suspension of the reverse split, [D]efendants had a duty to make their disclosure complete—they could not mislead investors into believing that the reverse split was tabled merely as a result of changing business conditions when, in fact, the transaction had been cancelled so that [GSV] could evaluate the two competing offers to take control of the Company, including one led by management." (Opposition. at 18.) With respect to the Court's prior holding, Plaintiff argues that he has cured the defects that formed the basis of the Court's dismissal. Particularly, Plaintiff states that he has alleged that Defendants repeatedly suggested to the public that no merger or acquisition was in the works because there was no interest in GSV from any potential merger or acquisition partner or any existing members of management or Class A shareholders, and cites ¶¶ 32–34, 43–44, and 98 of the Amended Complaint in support.

"To be actionable under the securities laws, an omission must be misleading." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir.2002). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108

S.Ct. 978, 99 L.Ed.2d 194 (1988). As the Court noted in its prior Order, "[a]n omission is not misleading unless it 'affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists.'" (Order, at 18:7–9) (quoting *Brody*, 280 F.3d at 1006).

In *Brody*, the defendant THC's board announced its plan to buy back $25 million worth of shares from stockholders in August 1996. *Id.*, at 998–99. In February 1997, a third party, Vencor, subsequently made a written offer to the THC board to purchase THC at a greater price per share. *Id.* at 999. In March 1997, THC issued a press release describing the progress and extent of its stock repurchase program, but the press release did not mention Vencor's purchase offer or any other company's interest in purchasing THC. *Id.* While the plaintiffs argued that the THC misled investors by not disclosing Vencor's purchase offer, the Ninth Circuit found that the public was not misled because THC never conveyed to the public that a merger or acquisition would not occur. *Id.* at 1006–07.

Similarly, in the instant case, although Defendants did not disclose that GSV had received competing merger bids in the January 20 Press Release, Defendants' statements regarding the status of the going private transaction did not mislead investors because Defendants never indicated that a merger or acquisition would not occur. Thus, Defendants did not have a duty to disclose the expressions of interest, and their failure to do so was not misleading.

Plaintiff, however, argues that this case is distinguishable from *Brody* because the Amended Complaint alleges that "[D]efendants *repeatedly* 'suggested to the public that no merger or acquisition was in the works' because there was absolutely no interest in the Company from any poten-

tial merger or acquisition partner or any existing members of management or Class A shareholders" in the December Proxy. (Opp. at 19, citing AC ¶¶ 32–34, 43–44, 98). Because Defendants did not cancel the December Proxy in light of the new possible merger developments, the December Proxy Statement remained effective, and, as such, Defendants had a duty to correct or make complete any inaccurate or misleading statements it contained.[6] But Plaintiff has failed to explain how this "omission," in light of the other information contained in the Press Release, was misleading.

The January 20 Press Release does not endorse the statements made in the December Proxy Statement. The January 20 Press Release, as cited in the AC, states:

Golden State Vintners, Inc . . . . today announced that it has indefinitely suspending, until further notice, the going private proposal described in the Company's definitive proxy statement dated December 30, 2003. As more fully described in the proxy, the proposal calls for a 1 to 5,900 reverse split of the Company's Class A and Class B common stock at a price of $3.25 per share. *The Company's Board of Directors has determined that in light of recently improved business and market conditions it is in the best interest of stockholders to suspend the proposal in order to provide more time to fully evaluate current conditions and the potential implications for stockholder value. Citigroup Global Markets Inc. has been retained to advise the Company in connection with its alternatives.*

The Annual Meeting of the Stockholders is scheduled to be held on February 5, 2004, which will be held as planned. The stockholders will be asked to consider the items specified in the proxy statement regarding the election of directors and the ratification of Deloitte & Touche LLP as the Company's independent auditors. *The vote on the reverse stock split has been indefinitely suspended until further notice.*

(AC at ¶ 94.) The January 20 Press Release did not suggest that the GSV was not considering a merger or acquisition but, rather, put the public on notice that the Company's status with respect to the going private transaction had changed as a result of "recently improved business and market conditions" and, consequently, information contained in the December Proxy Statement was no longer fully up to date. Thus, the Court finds Plaintiff has not sufficiently pled falsity with respect to the January 20 Press Release.

Plaintiff also alleges that the January 20 Press Release was misleading because the reverse stock split transaction had been canceled, rather than merely suspended, as indicated in the Release. (AC ¶ 97.) According to Plaintiff, "[b]y merely 'suspending' the transaction, [D]efendants did *not* withdraw the December Proxy, nor did they alert investors that the statements contained therein, including their opinion that the $3.25 share price was fair, were no longer reliable." (Opp. at 21.) Thus, Plaintiff asserts that "[a]bsent an express cancellation of the transaction, the Proxy remained effective, and [D]efendants were under a continuing duty to correct any inaccurate or misleading statements contained therein." (*Id.*)

As Defendants point out, Plaintiff does not appear to be arguing that describing the transaction as "indefinitely suspended" was itself a misrepresentation. Instead, Plaintiff's theory is that, by not expressly cancelling the transaction, Defendants al-

---

6. The Court has reviewed the cases to which Plaintiff cites and finds each inapposite.

lowed the December Proxy to remain effective, thereby misleading investors into believing that they could still rely on the financial projections and $3.25 fairness valuation in the Proxy. The Court has considered Plaintiff's argument and finds that it lacks merit. Although Plaintiff attacks Defendants' word choice in the January 20 Press Release, his theory that Defendants' failure to use the phrase "indefinitely suspended", as opposed to "cancelled" mislead investors into believing that the projections and fairness opinion in the December Proxy were still controlling, ignores the other information in the January 20 release indicating that the reverse stock split transaction would not be going forward "until further notice"; that the Company would be re-evaluating the current and business conditions to assess their implications for stockholder value; and that GSV had retained Citigroup to advise GSV in connection with its alternatives. This information thus gave context to the phrase "indefinitely suspended" and clearly advised the public that the transaction would not be proceeding. Moreover, as Defendant correctly points out, the phrase "indefinitely suspended" was accurate, in that, until GSV received and analyzed the offers to acquire the Company, Defendants could not have known whether reverse stock split transaction might be revived on amended terms. Based on these considerations, the Court finds that Plaintiff has failed to plead sufficient facts demonstrating that Defendants' characterization of the going private transaction as "indefinitely suspended" was false or misleading. This statement therefore cannot support Plaintiff's claim.

### b. Scienter

■ Additionally, Defendants assert that Plaintiff failed to plead facts that support a strong inference of scienter on the part of each of the Defendants. In his Amended Complaint, Plaintiff alleges that "[a]s their contemporaneous actions illustrate, [D]efendants [ ] did not view [TWG's] offer on January 7, 2004 as anything less than a bona fide statement of intention to take over the Company for $5.00 per share." (AC ¶ 100.) Plaintiff alleges that, GSV's reaction to TWG's offer, including the formation of a special committee and the hiring of outside legal and financial advisors to assist its evaluation of the offer, and Kelleher and O'Neill's act of instructing CW7 to perform extensive due diligence of GSV's business operations and to compile GSV's financial information, which was later provided to TWG's counsel, demonstrate that Defendants' considered TWG's offer to be legitimate. (AC ¶ 101.) Additionally, Plaintiff alleges that Defendant O'Neill's "immediate announcement of his intention to mount a competing offer for the Company, his formation of a group to carry out that intent, and the substantial purchases by members of his group [Uberoi and Bratton] before the suspension of the reverse stock split transaction was announced further demonstrate that the January 7, 2004 offer was viewed as a legitimate proposal that was far superior to the reverse split transaction." (AC ¶ 102.) In short, Plaintiff alleges that Defendants' failure to disclose TWG's serious and legitimate offer in the January 20 Release raises the inference that they deliberately suppressed the information while O'Neill, through Bratton and Uberoi, amassed enough control to make a counter offer. (Plaintiff's Opp., 23:15–19.)

Defendants assert these allegations are not sufficient. First, that Defendants purportedly compiled GSV financial information for TWG does not establish scienter because such practices are typical of pre-merger, confidential due diligence efforts. Defendants also assert Plaintiff failed to plead facts showing that they were aware

of any purchases by Uberoi and Bratton[7] at or prior to the time of the January 20 Press Release, or that the purchases were so out of line with prior purchases as to raise an inference of impropriety. Therefore, according to Defendants, such allegations relating to Uberoi and Bratton's purchases do not show scienter.

Plaintiff counters that his allegations that Defendants had actual knowledge of TWG and OAC's offers yet failed to include such information in the January 20 Press Release are sufficient to plead scienter. Plaintiff contends that even if the financial information Defendants provided to TWG was part of standard pre-merger practice, Defendants still misled investors: typical pre-merger activity does not legitimize providing the public with misinformation. Next Plaintiff contends the Amended Complaint adequately alleges Defendants were aware of Uberoi's and Bratton's stock purchases based on material nonpublic information because the two stockholders pledged their shares to OAC to aid it in the bid war. The Court agrees with Defendants that Plaintiff's allegations fall short of adequately alleging scienter.

As to the GSV financial information Defendants provided to TWG, the Court reiterates its finding that GSV did not mislead the public by failing to disclose the bid war. Further, the Court finds the allegations concerning Defendants' behavior, in light of potential per-merger negotiations, do not sufficiently allege nor support an inference of scienter.

As to Uberoi's and Bratton's stock purchases that were allegedly pledged to OAC for the bidding war, considering Uberoi's and Bratton's previous stock purchases,

Plaintiff has failed to plead facts showing that their purchases between January 7 and January 21 were abnormal, with respect to either amount or motivation. Although the Amended Complaint alleges Bratton did not own any shares in the company until December 29, 2003, and that Uberoi increased his holdings by 34% with his January purchase, Plaintiff does not connect the purchase to the allegedly false statements in the January 20 Press Release.[8] Equally likely, Uberoi and Bratton purchased their shares based on information revealed in the December Proxy, indicating a $3.25 per share reverse stock split. Plaintiff's only allegation trying to connect the stock purchases with the January 20 Press Release is OAC's Schedule 13D, which was filed on February 26, 2004, more than a month after Uberoi and Bratton purchased the shares at issue. Thus, the Court finds Plaintiff failed to adequately allege scienter.

### 3. February 18, 2004 10–Q, February 24 and March 8, 2004 Press Releases

Plaintiff alleges the February 18, 2004 Form 10–Q and the February 23 and March 8 Press Releases were false and misleading because such documents failed to reveal the bidding war between TWG and OAC or failed to reveal the full extent of the bidding war between TWG and OAC. Because Defendants had full knowledge of the bid war, according to Plaintiff, Defendants either intentionally or recklessly disregarding the misleading information contained in the February Form 10–Q as well as the February 23 and March 8 Press Releases. Defendants,

---

7. Bratton is not a named party in this action.

8. The allegation that Bratton first purchased GVS stock on December 29, 2003 and that Uberoi already owned GVS stock (*See* Amend. Compl. ¶ 105) cuts against Plaintiff's allegations that their purchases were part of O'Neill's scheme to outbid TWG given that TWG did not express interest in GSV until January 7, 2004.

however, argue Plaintiff does not have standing to assert such a claim.

### a. Standing

■ Defendants claim Plaintiff does not have standing to assert securities claims based on alleged misrepresentations or omissions as they relate to the February 18 Form 10–Q, the February 24 Press Release, or the March 8 Press Release because Plaintiff sold all of his GSV shares as of January 21, 2004. Plaintiff, on the other hand, asserts that the fact that the lead plaintiff sold his shares prior to subsequent misleading statements does not prevent him from asserting claims for later misrepresentations and omissions for the share class. Instead, according to Plaintiff, he may represent a class of plaintiffs during the entire period of the alleged wrongdoing, regardless of the timing of his individual sale, because Defendants misrepresentations occurred as part of an ongoing scheme. The Court agrees with Defendants.

Federal courts may only exercise jurisdiction over justiciable "cases" or "controversies." U.S. Const. art. III, § 2. As an aspect of justiciability, standing "is a threshold question." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In a securities case, strict standing requirements are important to prevent potential vexatious litigation. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739–41, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). "[T]he plaintiff class for purposes of a private damage action under § 10(b) and rule 10b–5 [is] limited to *actual* purchasers and sellers of securities." *Id.* at 730 (emphasis added). Potential plaintiffs, i.e., potential buyers and sellers, do not have standing to assert a 10(b) or 10b–5 claim. *See id.* at 738. Conduct for which a shareholder asserts a section 10(b) claim must occur before the purchase or sale of securities. *Binder,* 184 F.3d at 1066; *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1487 (9th Cir.1991).

In a class action suit, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy requirement with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). A plaintiff, however, cannot "circumvent the standing requirement simply because the plaintiff files his suit in a class action." *In re Bank of Boston Corp.,* 762 F.Supp. 1525, 1531 (D.Mass.1991); *see also Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir.1981). "[W]here a named class representative may properly pursue a claim, courts have strictly limited the class period to the period for which that named representative has standing." *In re Bank of Boston,* 762 F.Supp. 1525, 1531 (D.Mass.1991); *see, e.g., In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1126 (D.Del.1988); *Adair v. Sorenson,* 134 F.R.D. 13, 16 (D.Mass.1991) ("[Plaintiff's] standing ... must b based upon the injury suffered by [plaintiff], not any injury suffered by unidentified class member, and the [c]ourt must limit the claims accordingly.").

The Court finds *In re General Motors,* a case to which Defendants cite, on point. In *In re General Motors,* plaintiff shareholders filed a class action claim under Rule 10b–5 against General Motors ("GM") and several GM directors, alleging material misstatements and omissions. 694 F.Supp. at 1121. The lead plaintiff there sold all of his GM stock based on the alleged misstatements and omissions by November 20, 1986. *Id.* at 1126. Nonetheless, the lead plaintiff asserted the Rule 10b–5 claim on behalf of shareholders purchasing the stock from the summer of 1986

to December 1, 1986. *Id.* The court held the lead plaintiff did not have standing to assert misrepresentations and omissions on behalf of the class that occurred after November 20, 1986, the day on which he sold the last of his GM stock. *Id.* The court stated:

A court must assess standing to sue based upon the standing of the lead plaintiffs and not upon the standing of the unidentified class members. *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). As the United States Supreme Court stated,

Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, "none may seek relief on behalf of himself or any other member of the class."

*Id.* (quoting *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

\*    \*    \*    \*    \*    \*

Plaintiffs herein must allege injuries resulting from reliance upon defendants' material misstatements or omissions. No reliance can be established for events occurring after the purchase or sale of stock. Any injuries sustained by the named plaintiff necessarily resulted from events occurring prior to his last purchase on November 20, 1986. No action may be brought on behalf of unidentified members of the proposed class who made stock purchases after November 20, 1986 and were injured by misstatements or failure to disclose occurring after November 20, 1986. Plaintiffs have no standing to assert class claims based upon events after November 20, 1986.

*Id.* at 1126–27.

The Northern District of California seemingly agrees. In *In re VeriSign, Inc. Sec. Litig.,* 2005 WL 88969, 2005 U.S. Dist. LEXIS 10439 (N.D.Cal.2005). Judge Ware stated that, while a lead plaintiff can assert claims on behalf of a class of plaintiffs similarly situated, he must first establish standing in his own right. *In re VeriSign,* 2005 WL 88969, \*\*4–5, 2005 U.S. Dist. LEXIS 10439, at \*16–17. Because the court found that the lead plaintiffs had standing to assert their claims—that *they* suffered losses traceable to defendants' conduct and that *they* sought damages to redress *their* losses—the court found that lead plaintiffs could represent the class.[9]

---

**9.** Plaintiff relies on myriad cases to assert he does have standing based on an on-going scheme. Specifically, Plaintiff cites to *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975); *Harmsen v. Smith,* 693 F.2d 932, 942–44 (9th Cir.1982); *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598. The Court finds none of these cases dispositive as to the issue of standing. *Blackie* does not address the issue of standing but rather the issue of class certification. *See Blackie,* 524 F.2d at 891. In *Harmsen,* the plaintiffs had standing to assert section 10(b) claims for wrongdoing that occurred after plaintiffs purchased shares because they alleged conspiracy claims, in which the defendants were liable to plaintiffs for all damages that occurred during the period of the conspiracy. 693 F.2d at 942–44. In *Alfus,* the court there also recognizes that "[i]ndividuals who purchase prior to the performance of such allegedly fraudulent acts lack standing to complain about later misleading statements 'as they neither purchased or sold shares in reliance upon the alleged misrepresentation or concealment.'" 764 F.Supp. at 605 (quoting *Williams v. Sinclair,* 529 F.2d 1383, 1389 (9th Cir.1975)). The Court finds the other cases to which Plaintiff cites also inapposite.

Further, to the extent Plaintiff alleges the misrepresentations and omissions are part of

*Id.; see also Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598, 605 (N.D.Cal.1991).

Here, Plaintiff sold all his shares of GSV stock by January 21, 2004. Plaintiff, therefore, cannot show that he was harmed by the misrepresentations and omissions he alleges against Defendants after January 21, 2004 because he did not purchase or sell GSV stock after January 21, 2004. As a result, Plaintiff does not have standing to assert claims for misrepresentations or omissions that occurred after that date. Because Plaintiff is limited in the claims he asserts for the class to the period for which he has standing, Plaintiff cannot assert 10b or Rule 10b–5 claims with respect to the February Form 10–Q, the February 24 Press Release, or the March 8 Press Release.

### C. Plaintiff's Second Cause of Action Against O'Neill, Uberoi, O'Neil Group—Violations of 20A, 10b and 10b–5

In the AC, Plaintiff alleges insider trading against Defendants O'Neill, Uberoi, and OAC. Specifically, the AC asserts that Uberoi purchased GSV stock for the benefit of OAC while he was in possession of material, nonpublic information that O'Neill had given him. Defendants assert that Plaintiff's claim is deficient because Plaintiff fails to plead the requisite detail of insider trading liability, Plaintiff fails to plead a strong inference of scienter as required by the PSLRA, and Plaintiff fails to plead the requisite underlying facts to support a claim under Section 20A. The Court agrees with Defendants.

### 1. Section 10(b) and Rule 10b–5 Liability: Tipper–Tippee Liability

Defendants allege that Plaintiff's insider trading claims against Uberoi, O'Neill, and

OAC lack the basic facts needed to assert such a claim. Specifically, Defendants contend Plaintiff failed to adequately plead tipper-tippee liability with sufficient detail in order to support his claim. Plaintiff argues, however, that he sufficiently plead his insider trading claims under both a classical and a misappropriation theory.

#### a. Classical Theory

Under the classical theory, "[section] 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan,* 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). "Trading on such information qualifies as a 'deceptive device' under [section] 10(b) ... because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'" *Id.* at 652, 117 S.Ct. 2199. Under this theory, "'a person violates Rule 10b–5 by buying or selling securities on the basis of material nonpublic information if (1) he owes a fiduciary or similar duty to the other party to the transaction; (2) he is an insider of the corporation whose shares he trades, and thus owes a fiduciary duty to the corporation's shareholders; or (3) he is a tippee who received his information from an insider of the corporation and knows, or should know, that the insider breached a fiduciary duty in disclosing the information to him." *SEC v. Clark,* 915 F.2d 439, 443 (9th Cir.1990); *see also Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *Dirks v. SEC,* 463

---

an on-going scheme, the Court notes Plaintiff has not adequately pled a claim based on the December Proxy or the January 20 Press Release, which contain the scheme misrepresentations that occurred prior to Plaintiff's stock sale.

U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983).

■ Plaintiff does not sufficiently plead insider trading under a classical theory against any of the defendants. With respect to O'Neill and OAC, Plaintiff does not plead that O'Neill or OAC traded securities on the basis on material inside information. Although Plaintiff alleges that Uberoi bought the securities for OAC, Plaintiff does not plead that Uberoi was a member of OAC at the time he bought the securities, nor does he sufficiently allege Uberoi bought the stock based on the material, nonpublic information he supposedly received from O'Neill; Plaintiff fails to distinguish Uberoi's January 20, 2004 stock purchase from his other stock purchases.

Furthermore, as to Uberoi, Plaintiff contends Uberoi is liable as a tippee under the classical theory because he asserts in a blanket statement that "Uberoi received confidential information from an insider of the corporation (O'Neill and the O'Neill Group *vis-a-vis* O'Neill) in breach of their fiduciary obligations." (Plaintiff's Opposition to Uberoi's Motion to Dismiss, at 5:23–24.) Nonetheless, while Plaintiff alleges that Uberoi received information regarding the TWG offer from O'Neill and that Uberoi knew the information had not been publicly disclosed, he does not allege sufficient detail to establish that he knew or should have known that O'Neill breached a fiduciary duty in disclosing the information. Plaintiff's Amended Complaint requires the Court to make inferences based on other facts alleged that when he made his stock purchase Uberoi was, or should have been, aware that O'Neill was the president and CEO of GSV and breached a fiduciary duty in disclosing information to him. The Court need not indulge such unwarranted inferences. *See*

*In re VeriFone Sec. Lit.,* 11 F.3d 865, 868 (9th Cir.1993).

### b. Misappropriation Theory

■ A person can also be found liable for insider trading based on a misappropriation theory. *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199. "The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violations [section] 10(b) and Rule 10b–5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* "[A] fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id.* "[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information" *Id.* at 652–53, 117 S.Ct. 2199. Further, "the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but the source of the information." *Id.*

■ Although Plaintiff makes a blanket assertion that O'Neill tipped Uberoi, providing him with the details of TWG's offer, and Uberoi purchased GSV stock based on this tip, Plaintiff himself admits "the timing and circumstances surrounding the trades coupled with O'Neill's (and his associates') attempt to acquire [GSV] *compel the conclusion* that O'Neill and [OAC] conveyed material confidential information to ... Uberoi and the other members of [OAC] upon which they traded." (Plaintiff's Opposition to Defendants Motion to Dismiss, at 29:18–21 (emphasis added).) Plaintiff does not specify when Uberoi received the tip, or what material nonpublic

information O'Neill gave Uberoi. Moreover, Plaintiff does not plead any facts indicating a relationship between Uberoi and O'Neill at the time the purchase was made. Instead, the AC requires the Court to infer such details based on other facts Plaintiff alleged. Again, a court need not indulge unwarranted inferences in determining whether a plaintiff has adequately pled a necessary element. *In re VeriFone Sec. Lit.*, 11 F.3d at 868 (9th Cir.1993). Thus, the Court finds such pleading deficient.

As for Plaintiff's claim of tippee liability against Uberoi, Plaintiff's claim is equally lacking. Plaintiff's allegations again are only blanket assertions that Uberoi bought his stock based on information he received from O'Neill regarding TWG's offer. Plaintiff does assert when O'Neill allegedly tipped Uberoi or that Uberoi actually purchased the stock because he received the tip. In fact, Plaintiff states that O'Neill tipped Uberoi *and/or* another who purchased shares on or about the same date and that the tip, if Uberoi even received the tip, may have occurred after he purchased his shares. Accordingly, the Court finds Plaintiff has not adequately pled liability under a misappropriation theory.

### 2. Section 10(b) and Rule 10b–5 Liability: Scienter

Defendant Uberoi contends Plaintiff also failed to adequately plead scienter under the heightened pleading requirements of the PSLRA. Plaintiff counters that he pled Uberois' knowledge or recklessness with respect to his tippee liability with specificity, that Uberoi's purchases constitute unusual and suspicious trading sufficient to constitute scienter, and that Uberoi had the motive to trade based on material nonpublic information.

Even if Plaintiff's tipper-tippee allegations against Uberoi sufficed, the Court finds the pleadings deficient with respect to scienter. Plaintiff has failed to plead sufficient detail to claim scienter with respect Uberoi's purchase of GSV's stock. Plaintiff's conclusory allegations that Uberoi purchased the stock based on inside information with knowledge or at least reckless disregard are not supported because Plaintiff fails to distinguish Uberoi's January 20, 2004 purchase from his prior purchases of nearly two-thirds of the rest of his holdings. As to motive, even though Plaintiff asserts that Uberoi intended to contribute his stock to OAC so that OAC could purchase GSV, Plaintiff's allegations are lacking to the extent they do not allege Uberoi was even a member of OAC at the time or that Uberoi had in fact spoken to O'Neill prior to the stock purchase. Consequently, the Court finds Plaintiff did not adequately plead scienter with respect to Uberoi.

### 3. Section 20A Liability

Section 20A of the Securities Exchange Act prohibits sales by any person who trades in securities while in possession of material nonpublic information. Insider trading claims under Section 20A "require a predicate violation of a securities law, contemporaneous trading of a defendant and plaintiff, and a profit gain or loss." *Howard v. Hui,* 2001 WL 1159780, *6, 2001 U.S. Dist. LEXIS 15443, at *19 (N.D.Cal. Sept. 13, 2001). Because Plaintiff failed to sufficiently plead the predicate violations of the securities laws against Defendants, Plaintiff's Section 20A claim fails.

### D. Plaintiff's Third Cause of Action Against Defendants Against Defendants GSV, Brown, O'Neil, Kelleher, and O'Neil Group–Violation of Section 20(a)

Section 20(a) of the Act provides derivative liability for those who control others found to be primarily liable under

the Act. *In re Ramp Networks, Inc. Sec.,* 201 F.Supp.2d 1051, 1063 (N.D.Cal.2002). Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.* "In order a claim for liability under section 20(a), plaintiffs must alleged (1) that a 'primary violation' of Rule 10b–5 or other provision was committed and (2) that each defendant 'directly or indirectly' controlled the violator." *In re Cylink Sec., Litig.,* 178 F.Supp.2d 1077, 1089 (N.D.Cal.2001); *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996). Because Plaintiff failed to adequately assert the underlying Section 10(b) violations, the Court must also dismiss the Plaintiff's Section 20(a) claim.

### E. Dismissal With Prejudice

"Dismissal with prejudice and without leave to amend is not appropriate unless it is clear ... that the complaint could not be saved by amendment." *Eminence Capital v. Aspeon Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003). Here, Plaintiff has already amended his complaint once. In doing so, Plaintiff failed to cure the deficiencies of his claims under the heightened pleading standards of the PSLRA. Although Plaintiff adds a new Defendant and asserts his claims based on new misrepresentations and omissions, the Court finds Plaintiff does not have standing to make these new allegations. The Court notes, however, that Plaintiff may be able to name other class members that have standing to assert the claims with respect to the February Form 10–Q, and the February 24 and March 8 Press Releases. Accordingly, the Court **DISMISSES** Plaintiff's Amended Complaint with leave to amend.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss in its entirety, **WITHOUT PREJUDICE.**

Plaintiff must file any Second Amended Complaint within 30 days of the filing date of this Order.

**IT IS SO ORDERED.**